IN THE UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

STEVEN W. KRAFCHICK,
SBI#00178856                                    Civil Action No. 07-284-GMS
Delaware Correctional Center
1181 Paddock Road
Smyrna, Delaware. 19977
Petitioner,

IN THE UNITED STATES DISRICT COURT
DISTRICT DELAWARE

     Vs.

THOMAS L. CARROLL (Warden)
Delaware Correctional Center
1181 Paddock Road
Smyrna, Delaware. 19977
Respondent.

THIS IS A NON-CAPITAL CASE



RECEIVED

AUG 2 8 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

SUPPORTING DOCUMENTS

## TABLE OF CONTENTS

1.    Sentencing Transcripts

2.    Mandell J. Much Ph. D (Psychiatrist Report)

3.    Carol A Tavani M.D. (Psychiatrist Report)

4.    Correctional Medical Reports

5.    PDRhealth Report on (Sinequan)

6.    Pixel Perfect Software Report on (Doxepin Hydrochloride)

7.    RxList Report on (Vistaril)

8.    Dr. Schueler's Report on (Hydroxyzine Hydrochloride)

9.    Sentencing Order 2/13/2002

10.   Plea Agreement 2/13/2002

11.   Truth in Sentencing Form 2/13/2002

12.   Immediate Sentencing Form 2/13/2002

13.   Delaware Sentencing Commission Accountability Sheet (Exceptional Sentences)

14.   Del. C. § 6581 Sentencing Guidelines

15.   Official Court Records

1

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,        I.D. No. 0101010964

    Plaintiff,

v.                        IN01-01-2351,
                          IN01-01-2352

STEVEN KRAFCHICK,

    Defendant.

BEFORE:   HONORABLE CHARLES H. TOLIVER, IV., J.

APPEARANCES:

    MARSHA J. EPSTEIN, ESQ.
    MARIA TERESA KNOLL, ESQ.
    Deputy Attorneys General
      for the State

    EDWARD C. PANKOWSKI, JR., ESQ.
    KATHRYN B. LUNGER, ESQ.
     For the Defendant

PLEA TRANSCRIPT
February 13, 2002

DOMENIC M. VERECHIA, RPR
SUPERIOR COURT OFFICIAL REPORTERS
1020 King Street - Wilmington, Delaware  19801
(302) 577-2400 Ext. 416

---

2

February 13, 2002
Courtroom No. 203
11:12 a.m.

PRESENT:

    As noted.

- - - - -

MS. EPSTEIN: Good morning, Your Honor.

MR. PANKOWSKI: Good morning, Your Honor.

THE COURT: Good morning.

Can I see counsel at sidebar for a minute. Not a problem. I just need to know something.

(Sidebar off the record.)

MS. EPSTEIN: Your Honor, this is the State of Delaware v. Steven Krafchick, in this matter which you're currently presiding over in superior court.

He is going to be pleading guilty to murder in the second degree, a lesser included offense of Count I; and possession of a deadly weapon during the commission of a felony. And the State will enter a nolle prosequi on the remaining charges.

The defense will ask for a presentence investigation. I signed this on behalf of the State. Mr. Pankowski signed the plea, as did Ms. Lunger, and the defendant, Steven Krafchick.

---

3

1    MR. PANKOWSKI: Your Honor, Steven Krafchick is
2  to my right.
3    We had the opportunity to speak to him today.
4  This plea offer was tendered by the State of Delaware
5  this morning. It, in fact, was tendered by the defense
6  several weeks ago. He was willing to enter this plea to
7  the exact same charges, murder second degree as a lesser
8  offense and possession of a deadly weapon during the
9  commission of a felony.
10    He's been advised by myself, co-counsel
11  Ms. Lunger, and Marilyn Munson. And his mother got
12  word, although not direct contact with Steven, that she
13  would advise him to enter this plea under the
14  circumstances.
15    I had an opportunity for almost an hour to
16  discuss the matter with him in the jury room. He signed
17  the plea documents in my presence. He understands the
18  consequences of his plea, that the trial will cease.
19  The jury will be dismissed. He does not have the
20  opportunity or the misfortune, whichever way, of hearing
21  the jury's verdict in the nature either tomorrow or the
22  following week. So he understands that the case will
23  stop, and his sentencing will take place at the next

---

4

1  point.
2    The State wants immediate sentencing. I
3  expressed to the Court that we would like sentencing in
4  the near future after a presentence investigation is
5  conducted. I believe Title 11 would mandate in most
6  cases a presentence report. I don't know if the Court's
7  inclined to do that or not.
8    But Mr. Krafchick knows for murder second he's
9  facing a mandatory ten-year sentence and a maximum up to
10  20 years; the weapons charge, the mandatory two years
11  and a maximum 20 years. So he's facing a maximum of 40
12  years incarceration. He signed the documents in my
13  presence. And I would urge the Court to accept his
14  guilty plea.
15    I believe the indictment should be amended
16  accordingly to reflect the reckless killing of the
17  deceased and not the intentional killing as alleged at
18  this point.
19    THE COURT: Ms. Epstein, do you want to write
20  the particular language in the indictment.
21    MS. EPSTEIN: Yes, Your Honor.
22    Mr. Krafchick, for the record, please state
23  your full name and address.

A-1

5

THE DEFENDANT: Steven W. Krafchick.

THE COURT: And your address prior to the incarceration.

THE DEFENDANT: 207 North DuPont Highway, Apartment 1.

THE COURT: How old are you, sir?

THE DEFENDANT: 37.

THE COURT: How much education do you have?

THE DEFENDANT: Eighth grade education.

THE COURT: What do you do for a living?

THE DEFENDANT: A waitress. I mean a waiter. Sorry.

THE COURT: No problem.

Sir, it's my understanding you wish to enter a plea to two counts of criminal offenses, murder in the second degree as a lesser included of murder first degree, in Count I of the indictment, IN01-01-2351; and Count II, possession of a deadly weapon during the commission of a felony, IN01-01-2352. And that those offenses took place on January 15th, 2001, in New Castle County, State of Delaware.

Did you commit those offenses on that date, sir?

6

THE DEFENDANT: Yes, sir.

THE COURT: In my left hand I have the plea agreement. Did you review this document with your attorney, and is that your signature?

THE DEFENDANT: Yes, sir.

THE COURT: And I'm going to go over a couple of things.

In my left hand now I have the Truth in Sentencing/Guilty Plea Form.

Did you review the form and provide the information shown?

THE DEFENDANT: Yes.

THE COURT: Did you understand the constitutional rights and civil liberties you'll be giving up by entering this plea as well as the range of penalties that could be imposed up to 40 years and with a minimum of 12?

THE DEFENDANT: Yes, sir.

THE COURT: I'm going to add 12 to 40 and initial it, although you and your attorney said 40. That is the maximum. And that's what the blank says.

Do you understand that you had a right, and you're giving up by pleading guilty; you will not have a

7

1  trial and you waive or give up your constitutional right
2  to be presumed innocent, to a speedy and public trial,
3  to a trial by jury, to hear and question the witnesses
4  against you, to present evidence in your defense, to
5  testify or not to testify, and to appeal to a higher
6  court? Do you understand that?
7      THE DEFENDANT: Yes, sir.
8      THE COURT: And is that your signature?
9      THE DEFENDANT: Yes, sir.
10     THE COURT: Sir, do you have any questions
11 regarding either document or any other aspect of this
12 matter?
13     THE DEFENDANT: No, Your Honor.
14     THE COURT: Is anybody forcing you to do this,
15 sir?
16     THE DEFENDANT: No, sir.
17     THE COURT: Are you doing it of your own free
18 will?
19     THE DEFENDANT: Yes, sir.
20     THE COURT: Have you fully discussed this
21 matter with your attorneys and are you satisfied with
22 their representation?
23     THE DEFENDANT: Yes, sir.

8

1      THE COURT: And, again, do you have any
2  questions for the Court regarding any aspect of this
3  matter?
4      THE DEFENDANT: Just mercy on me, sir.
5      THE COURT: I understand.
6      Have you had any drugs or alcohol within the
7  last 48 hours?
8      THE DEFENDANT: No, sir.
9      THE COURT: Are you now or in the past two
10 years been a patient in a mental institution or under
11 the care of a psychologist or psychiatrist?
12     THE DEFENDANT: No, sir.
13     THE COURT: Do you understand the consequences
14 of what you are doing?
15     THE DEFENDANT: Yes, sir.
16     THE COURT: Now, Mr. Krafchick, I'm going -- in
17 terms of a plea itself, I know you discussed it with
18 your attorneys and I know, indeed, according to
19 Mr. Pankowski, you proposed it or at one point had
20 considered this previously. And I believe your plea is
21 a knowing and intelligent and voluntary one, given the
22 circumstances, and I do so accept the same.
23     I'm going to proceed to sentencing. And,

9

Mr. Pankowski, and I don't want to call her by her first
name, but I always forget --
    MS. LUNGER: Lunger.
    THE COURT: Lunger. I'm sorry.
    Ms. Lunger had gone over it with you.
    And I think one of the more compelling
documents in this case, although I would have written it
differently for the purposes of trial, was the
evaluation by Dr. Much which outlined a fair amount of
your social and educational history.
    From that document, as I informed counsel, I
got a fairly decent picture of what I thought was your
history. And from this part of the trial and listening
to the testimony up to today, I got a fairly decent idea
of the kind of tumultuous nature of the relationship was
between you and the decedent.
    And I think, based upon that and based upon
just general experience as a judge in this court and
looking at your record here, which is consistent with
the evaluation, some I guess residential domestic
contact between you and your wife, and a lot of it, what
I call minor offenses of the misdemeanor variety.
    Is that the findings report?

11

1  trial before the jury is one thing; what I consider at
2  sentencing is a horse of a different color.
3      I'm going to read Dr. Tavani's report because I
4  had not seen that before because she was going to
5  testify today. I'm going to take five minutes, ten
6  minutes. I mean, it doesn't take me that long. Couple
7  pages I've read so far seems to track what Dr. Much said
8  down to the description of the colonoscopy which
9  reversed itself.
10     So I think we're in a pretty good situation to
11 proceed. And I'm 99 percent sure I'm going to go to
12 immediate sentencing.
13     What I wanted to say to you, Mr. Krafchick, is,
14 look, this was perhaps one of the more tragic cases that
15 I've seen here. And no homicide is a good case. No
16 homicide is not tragic. But I don't think you and your
17 wife were bad people. Sometimes people have
18 questionable character. You had some issues. And you
19 had some conditions and problems that unfortunately we
20 in society were not able to address. And that makes me
21 feel sad, but there's not much I can do about that.
22     But I do think this plea will allow you very
23 real expectations, hope of getting out in time to see --

10

    MS. EPSTEIN: Yes, sir.
    MR. PANKOWSKI: Your Honor, just for the
record, we would oppose immediate sentencing. There
were witnesses that were to be called but for the plea
entered by my client. Dr. Tavani's report is before
Your Honor. There would be statements made by certain
civilian witnesses.
    We would like the opportunity to submit those
to a presentence officer to compile those in a report to
present to the sentencing judge at a later date.
Whether that's a week or six weeks or what, we would ask
the opportunity to present those documents to enable the
court to sentence this case according to a
recommendation made by a presentence officer.
    MS. EPSTEIN: Your Honor, I'm going to allow
you to read Dr. Tavani's report. And then I'll respond
to Mr. Pankowski's question.
    THE COURT: What I'm going to do is I'm going
to take a very brief recess.
    I read Dr. Much's report. What I started to
say, I found it comprehensive in its description.
Although Mr. Pankowski may argue that, but you were
going to exclude it. An admission into evidence at

12

1  to have life. When I say have some life, there are
2  current guidelines. One has to serve three-quarters of
3  any sentence imposed, total sentence imposed. But you
4  have two children and they will ultimately, if they so
5  desire, have children. And you'll be able to maintain
6  contact with them, I would assume, but at some point get
7  out. I believe the average life expectancy of the
8  sentence won't be reduced.
9      But I think this is probably a reasonable, just
10 resolution of what was and is appears to me a very
11 tragic and unfortunate situation. And if someone had
12 been able to stop you earlier or stop the relationship
13 or somehow intervene, but it wasn't possible. And there
14 is a penalty to be paid, and the law requires it because
15 it must discourage these types of situations.
16     But in no way did the testimony or evidence
17 imply that, not that it would make a difference, that
18 your character or her character was a question as far as
19 I'm concerned. It's just tragic and it's sad. And
20 you'll have to live with it. And I think that's
21 probably a far more difficult punishment than anything I
22 can impose on you.
23     That's life. Your kids have to live with it.

A - 2

13

Because they've lost a father and a mother. And your wife's mother and family has to live with it. And your mom has to the live with the loss of her son. This is just a loser all the way around, including the court.

That won't do much for you, but I thought I would let you know how I saw it.

And let me read this. And I will do what I have to do. But it is with no sense of anything good that I approach this task. And no sense of anything positive that we find ourselves here. So that may not do much for you. At least I owed you that --

THE DEFENDANT: Thank you, Your Honor.

THE COURT: -- and your family, I might add.

Let me stand in recess until the call of the court. But I don't think it will be any more than ten minutes at best.

(A short recess was taken, 11:30 a.m. to 11:46 a.m.)

THE COURT: I do intend to proceed to immediate sentencing.

I read Dr. Tavani's report. And it was pretty much, not identical, but very close to in terms of the social, medical history of Dr. Much. There were a

14

couple of added factors in it, but they were both extensive and comprehensive in terms of what I would address at sentencing.

I'm not sure what else a presentence investigation would add that I don't already know. I know how the crime was committed. I obviously know who committed it. I know a fair amount about the social history of the parties, which, again, is well documented through the defense experts. And I've had 12 years of experience. I'm not so sure at this point a presentence investigation would benefit or assist me in that process.

So I'm going to proceed, as I indicated I would.

Obviously, if there's anything that the defense wants to add to the record at this point, they should feel free to do so. Or alternatively, there is always the option of examination for a motion to reduce sentence. But I think I have a fairly comprehensive idea what the situation is at present.

(Pause.)

MS. EPSTEIN: Your Honor, I know you just directly asked Mr. Pankowski a question and you're

15

waiting for his response, but in that interim I just want to point out that since the Court is interested in proceeding with immediate sentencing and since there are family members here, they certainly have the right to address the Court. I have not even asked them today to address the Court.

THE COURT: You're right. They're allowed to.

MS. EPSTEIN: Would you want to hear from them first, if somebody wants to speak to their feelings? Because that is normally part of the presentence investigation as to the defendant's version of --

THE COURT: They're entitled to by statute. I don't think Mr. Pankowski would object to that.

(Pause.)

MS. EPSTEIN: Do you want to hear from them at this point?

THE COURT: Yes. But the defense makes its presentation.

MR. PANKOWSKI: Your Honor, we would also like a request for the defendant's mother to say a few words on his behalf.

THE COURT: It's not allowed by statute, but I'll allow it.

16

MS. EPSTEIN: For the record, this is Mrs. Hilda Wilson. This is Dawn Krafchick's mother.

THE COURT: Is she speaking for the family?

MS. EPSTEIN: Yes, she is.

MS. WILSON: I just like to say that it's very difficult for me, too, and these children. Before this happened I've had the children for two and a half years. I dealt with them, got them in to see psychiatrists and stuff. I just think that we need to go on with our life, that he should be sentenced right away so that we can go on with our lives and try to put this behind us.

I also wanted everybody to know, I have no hard feelings with his mother. They're her grandchildren. She has the right to see them any time she likes. But we would like to go on with this and have him sentenced.

THE COURT: Ma'am, for what it's worth, as I said to Mr. Krafchick, this is about as unpleasant as it gets. And I really commend you and his mother, because you've had a burden that no mother of having raised their kids should have to deal with, either loss to death or imprisonment of their child.

While I don't know personally and don't want to have that experience, I've had the unpleasant duty as a

A - 3

17

lawyer of going to family court with two grandmothers to
get custody of their children because the husband and
wife are married, much like this, and watched two
grandmothers tell a family court judge that their
children were unfit in tears. I've seen it before,
ma'am, as a lawyer. It tore me up then. And I'm a
little older now and it still doesn't make me feel real
good.

At least the one positive thing out of this is
that those kids have two grandparents that they can look
to and help with counseling in growing up. That's about
the best that they could hope for. And that is really
good. So I commend you and I commend his mother to work
together and to help those kids. Because they are your
family. And they're the ones now that need you. You
can't bring your daughter back. And you're not going to
be able to -- his mother is not going to be able to get
him out of jail and restore his life.

So I do commend you. And you did step up to
the plate, as they say. And apparently you've done an
excellent job and will continue to do an excellent job.
And I'm sure his mother will help and do whatever is
necessary.

18

I can't make it any better. That's the one bad
thing about being the judge; you can impose penalties;
you can let people out; you could put people in; but you
can't make them feel better.

MS. WILSON:  Thank you, Your Honor.

(Pause.)

THE COURT:  I'm sorry. I don't know -- I knew
her name, but I had forgotten it.

MS. LUNGER:  Myers.

MR. PANKOWSKI:  On behalf of the defendant,
Nancy Myers would like to address the Court. This is at
my client's request.

THE COURT:  I understand.

(Pause.)

MS. MYERS:  Your Honor, my son is a good boy.
He's done some things that we know were not the right
things to do. There's been no winners in this case.
These children have lost both of their parents now. I
love my son, and I will stand by him. And I hope that
the Court finds some pity in your hearts for him.

THE COURT:  As I said to Mrs. Krafchick's
mother, and, again, I say to you, you haven't had it
easy. There have been a lot of things in the social

19

history and the reports of Dr. Tavani and Dr. Much which
were very detailed. Everybody's had their fair share of
hardships in this. And you've lost two people close to
you. I know. Because I've had the report. And that
had an impact upon him.

I wish I could make it go away, ma'am, but I
can't. And I've got a job to do, an unpleasant job.
But at least I think that this resolution will put him
in a position at some point to at least have some hope,
anyway. And, like I said, this is, to say there are no
winners, with all due respect to you, is the extreme
understatement. Everybody in this case lost and lost
big time, starting with the victim, Mr. Krafchick, and
most importantly those two girls, so.

MS. MYERS:  Thank you, Your Honor.

(Pause.)

MR. PANKOWSKI:  Your Honor, both of our
experts, Dr. Much and Dr. Tavani, are present in the
courtroom. The Court has reviewed Dr. Much's report.

THE COURT:  I also reviewed Dr. Tavani's
report, who I might add, probably equivocated in
negotiating with the parties between not guilty by
mental illness -- excuse me -- not guilty by reason of

20

mental illness, guilty but mentally ill, and also
extreme emotional distress. I think we had the same
kind of factual issues and legal argument. It was very
comprehensive. And both doctors ought to be commended
for their degree and scope of their reports. Even
though I probably wouldn't have admitted it into
evidence, it certainly was helpful to me in sentencing.

MR. PANKOWSKI:  Dr. Much's report, page 6,
about what is to happen to Mr. Krafchick in the future:
"His dependent personality and his extreme emotional
distress led to this offense.

"Mr. Krafchick's current system will not abate
in the near future. Personality disorders as well as
addictions are enduring by nature. All individuals can
overcome depression, anxiety. Given Mr. Krafchick's
personality style and limited resources, it is unlikely
that he will ever be free fully of psychological
problems. Therefore, continued psychiatric treatment,
including medication, will be required in the future to
address some of his symptoms."

I would urge the Court to put in the sentencing
order that Mr. Krafchick will be rendered some
psychiatric treatment as is requested. And, hopefully,

**21**

Drs. Much and Tavani will be in contact with him in the future.

He is under medication. At this point we would ask that the court order continue that medication.

There was some concern that we had as co-counsel that Mr. Krafchick might commit another suicide attempt in the near future. We urge that suicide watch at the jail continue based on the Court's sentence.

Dr. Tavani's report kind of sums up in a nutshell why this happened. Her report says that there was acute stress reaction and disorder or extreme emotional distress under the circumstances.

There are factors that led Mr. Krafchick up to a certain point. He had lost all and basically lived a life lost as of January 13th, two days before the homicide. He lost his vehicles, lost his house, lost all his money, was living at motels, lost his two children and most of his friends. We had some friends that might -- were available to testify in our case.

Then there was a glimmer of hope. He had been drug free from December 20th until January 14th. He and his wife Dawn had obtained an apartment. He had helped

**22**

pay for that. He had the phone in his name and actually still has a bill for that. The children were back, although briefly.

This person Chuck, who was the person involved with the deceased, surfaced briefly Saturday night on the telephone. According to our records, Dawn said she's done with Chuck. These two people did cocaine because that's what Dawn wanted to do. He broke his abstinence. They had sexual relations that night. They were going to go into detox either that morning or that afternoon when she went to the restaurant.

Then when she backed out of his plan, their plan, he saw the dissolution of his last hope, fresh start of his relationship with her of reclaiming his family disappeared, suddenly lost control, snapped, and dissociated and committed this offense.

There were many, many factors involved in Mr. Krafchick and his activities of January 15th. We submit to you there are several mitigating factors which would dictate the Court not giving a maximum sentence at least on the weapon's charge. He was under the influence. There was physical and mental impairment. And we submit that was extreme emotional distress as a

**23**

1  mitigator.
2       The knife was not brought to the restaurant by
3  him. The knife, according to all witnesses we know, was
4  on that butcher block table. There was another knife
5  down the hallway that was originally in play when he was
6  grappling with the deceased, but that was not used by
7  him. In fact, he used the knife on his own wrist.
8       And he still has, Your Honor -- we tried to get
9  this evidence in, but he still has problems with his
10  wrist. There's tendon damage. There's obviously
11  deformity to his fingers. Unfortunately, he was not
12  given the prescribed physical therapy while at the
13  Gander Hill facility. And Dr. Danyo, although he didn't
14  testify to it on the record, said that that physical
15  therapy probably would have resolved his hand.
16       I agree with Your Honor. Nobody wins here;
17  everybody loses. Steven Krafchick, whatever sentence
18  the Court imposes must not lose hope. Because at least
19  at some point in the future he will be released back
20  into society. I just hope that the psychological impact
21  on him will be addressed by the correctional people,
22  that they will permit him psychiatric evaluation
23  periodically.

**24**

1       He will be able to get his GED, since he only
2  finished eighth grade. And he will concentrate on doing
3  things in the prison that will enable him to be released
4  back into society.
5       Whether his family wants contact with him at
6  that point remains to be seen. That's obviously their
7  decision. But it comes some point where society as a
8  whole must accept him back based on what price he is to
9  pay for this crime.
10       I would only urge the Court, if the Court is to
11  give him the State's recommended sentence, which I
12  believe is the maximum, that that apply only to the
13  murder second degree. And that the Court give him the
14  guidelines of the two to five years on the weapon
15  charge.
16       Mr. Krafchick would like to address the Court
17  at this point.
18       MS. EPSTEIN: If the State may be heard first,
19  or do you want to hear from the defendant?
20       THE COURT: I'll hear from the defendant first.
21       THE DEFENDANT: Your Honor, I'd first like to
22  address to both of the families how remorseful and
23  regretful this whole tragic event has happened and

25

putting emotional scars on the lives of my children and the families that it involves.

If there was any way I could take back that day, I would.

There was a love that me and my wife had, which in society's standards may not been right, but we tried to deal with it the best we could and involving feelings and emotions that I couldn't deal with.

So addressing both the families, I ask for forgiveness and mercy from the Court and families.

THE COURT: Thank you, sir.

Ms. Epstein, briefly.

MS. EPSTEIN: Yes, Your Honor, briefly.

I think it needs to be pointed out to the Court that this is not an isolated incident of domestic violence. And I think it's very important to note that, unfortunately, this couple, not only was caught in a cycle of addiction, but this couple was caught in the cycle of domestic violence. And it went on through the whole entirety of their marriage, at least certainly for the last ten years of their marriage.

I agree wholeheartedly with Dr. Much's evaluation that Steven Krafchick was a very dependent

26

person. He was dependent upon Dawn. And this was his first love and really frankly probably only love and certainly a long-lasting relationship since the earlier teens.

Unfortunately, with people who have domestic violation issues, there's issue of power and control. And repeatedly Steven Krafchick controlled Dawn, her behavior, who she could go and see, where she could go, what she could do unless he was with her. And he used that control over and over and over again.

Your Honor, it's the State's position, and I want to highlight to the Court, 'cause it's something that, although I know Your Honor is aware of, perhaps others sitting in the courtroom are not, the three weeks before this offense on December 20th, he kept Dawn locked in a motel room for four and a half hours, during which time he threatened to kill her. And, in fact, said to her, I am going to kill you; I don't care if I go to jail.

This is the mindset of somebody who saw his life slip away because Dawn was becoming independent. She was saying to him, no, I'm not going along with your plans anymore; I want my own apartment; I want my own

27

1  life; I can see who I want; I can talk to who I want;
2  and you can't tell me what to do anymore.
3       And this is a man who couldn't take that. This
4  is a man who thought he was losing it all, his control.
5  And he lost control. And he killed her. And for that
6  he deserves the maximum penalty under the law.
7       MR. PANKOWSKI: Your Honor, I think the control
8  person the State wants you to believe is possibly
9  incorrect here. In fact, the day before the event, the
10 deceased was caught by him directly with this person
11 Chuck, which was a major impact on his decision-making
12 process.
13      THE COURT: Mr. Pankowski, Ms. Epstein, I'm not
14 trying the victim. And I'm not even trying
15 Mr. Krafchick anymore. I'm sentencing him.
16      You know, the world is not a perfect place.
17 And I don't know of too many saints walking around on
18 the streets of Wilmington, Delaware, male or female,
19 married or single. It's a real world, and I have to
20 deal with it. I don't judge her social life or his.
21      Yes, there was domestic violence. Yes, there
22 was some issue of control. But also there was a taking
23 back, a jockeying of PFAs, reinstituting PFAs.

28

1       You know, Mr. Krafchick has pled guilty to an
2  offense. He did it. Now it got this way and if I had
3  to weigh it on the scales of justice as to who was
4  culpable for the demise of their relationship and the
5  damage to their children, I don't know. I'm not a
6  family court judge. I'm not sure I'm capable of making
7  those kinds of assessments.
8       But it's not, you know, good or evil. It's
9  about somebody who did something they weren't supposed
10 to do. And there's a law. And the law says I have to
11 consider several factors. One of which is the severity
12 of the offense, because I can't bring her back.
13      Two, the nature of the way the offense was
14 committed, I believe; three, the benefit or sizeable
15 objectives a sentence would impose.
16      And I do think that we have to make it clear,
17 this sentence won't stop anything, I don't think. What
18 it will do and it will tell people and tell people
19 working in the field, you know, society does care; the
20 system does care. If you do this you will go to jail.
21      It's not saying Mr. Krafchick is a horrible
22 person or Mrs. Krafchick was a saint or a sinner. I'm
23 not making that judgment. And I want that to be clearly

29

noted.

What I am saying is I know they had problems. There was good and bad on both sides. Unfortunately, nobody was able to help them eliminate their problems, while the grandparents stepped in and did what they needed to do, and I commend them again for that.

So I know -- and I'm not God. I'm simply a judge. Somebody else will have to determine who was good or evil.

Having reached that conclusion so many years ago and having reviewed the facts in this case, it is the sentence of this court -- I think the effective date was January 16th, 2001?

MR. PANKOWSKI: Yes, Your Honor.

THE COURT: He arrested on the date of the offense or was it the 15th?

MR. CARR: 16th, Your Honor.

THE COURT: On the charge of murder second, that you pay the cost of prosecution, which I'm suspending, and that you be remanded to the custody of the Department of Corrections for 20 years at Level V -- excuse me -- suspended after 20 years for six months at Level II pursuant to 11 Del. C. Section 4204(1).

30

By law, Mr. Krafchick, if I impose the maximum on the sentence, I must follow it with a period of probation. However limited and however nonsensical it may seem to you, that is the law.

So I impose the maximum term to end six months at Level II and then probation.

On the charge of possession of a deadly weapon during the commission of a felony, consecutive sentence, pay the cost of prosecution, which I'm suspending, and be remanded to the custody of the Department of Corrections for 20 years at Level V. That must be served in its entirety.

During the course of this sentence, you must undergo a substance and/or alcohol abuse evaluation and participate in any residential in or outpatient drug or alcohol treatment programs that are deemed appropriate as a result.

You must also undergo a mental health evaluation and continue with any present treatment as well as undertake any new effort determined appropriate based upon said evaluation.

You should have no drugs or alcohol unless medically prescribed. And you should be subjected to

31

1    random drug and alcohol screening at the direction of
2    your probation officer once you are released from Level
3    V.
4           And I say once you are released. And while I
5    do not construe sentences unless it comes in the form of
6    a Rule 61 petition, it seems to me that under our
7    current law you will serve three-quarters of any
8    sentence so imposed, which in this case would mean 30
9    years of the 40, which, if my calculations are correct,
10   then you will all, life expectancy tables being
11   accurate, be released within what would be the normal
12   life expectancy of someone your age and social status.
13          I impose the maximum, Mr. Krafchick, because it
14   was a serious felony. It was a violent felony. And I
15   think in the area of domestic violence we have to make
16   it clear, one person does not own another person. One
17   person cannot tell another person to come or go or to
18   stay once they reach the age of majority, anyway.
19          And while, again, this was an unfortunate
20   situation; I think I have an obligation, not only to
21   your children and your family, but to the families of
22   other people who may find themselves in that particular
23   position.

32

1           At least the prosecutor, at least defense
2    attorneys, at least Dr. Tavani and Dr. Much, Mrs. Munson
3    can say to people, Don't do this. This would only lead
4    one bad way, and you will be sanctioned.
5           So it's a message. I'm not so sure how
6    effective it is. But I think we have no choice but to
7    try.
8           Would it have stopped you? Maybe not. But
9    maybe it will stop somebody else. And at least I'm
10   hoping it will.
11          So I'm not happy with it, but I felt compelled
12   to do that and to do it in this fashion. And I hope you
13   are able to deal with the demons and illness which I
14   think will conflict you for a considerable period of
15   time.
16          As to any suicide watch, Mr. Pankowski, that
17   the Department of Corrections will have to determine.
18   I'm not competent to make such an assessment.
19          I've watched Mr. Krafchick here. And just
20   because he seems to be appropriately acting or acting
21   appropriately here, obviously doesn't have anything to
22   do with what happens over there.
23          But I would ask correction officers to inform

33

them that there may be some concern or that maybe the
prison medical staff should look into whether or not the
suicide watch is appropriate.

And that's not in any way to say,
Mr. Krafchick, that you are considering that. I don't
know. I hope you don't, because I still think you have
a lot to live for. Your two kids need their father.
You mother needs her son. So regardless of what you
think of yourself, do us a favor and think of them.

THE DEFENDANT: Yes, Your Honor.

THE COURT: Counsel, anything else before the
Court?

MR. PANKOWSKI: No, Your Honor.

MS. EPSTEIN: No, Your Honor.

THE COURT: That being the case, the Court,
therefore, stands in recess.

(Whereupon the proceedings concluded at 12:17
p.m.)

34

STATE OF DELAWARE:

NEW CASTLE COUNTY:

I, Domenic M. Verechia, Official Court Reporter
of the Superior Court, State of Delaware, do hereby
certify that the foregoing is an accurate transcript of
the proceedings had, as reported by me in the Superior
Court of the State of Delaware, in and for New Castle
County, in the case therein stated, as the same remains
of record in the Office of the Prothonotary at
Wilmington, Delaware, and that I am neither counsel nor
kin to any party or participant in said action nor
interested in the outcome thereof.

WITNESS my hand this 27th day of June, 2002.

Domenic M. Verechia, RPR
Cert.#162-PS

Mandell J. Much, Ph.D., DABPS
Licensed Psychologist
C/o Aquila Of Delaware, Inc.
2110 Duncan Rd.
Wilmington, DE 19808
(302) 999-1106
fax (302) 999-1753

## Psycho-forensic Evaluation

**Patient's Name:** Steven Krafchick
**Date of Birth:** January 6, 1965
**Dates of Evaluation:** April 10 & June 11, 2001
**Date of Report:** September 10, 2001

**Reason for Referral:** Mr. Krafchick was referred for a psycho-forensic evaluation by his attorney, Mr. Ed Pankowski, to assess general psychological functioning in preparation for upcoming trial. Specifically, this evaluation was completed to determine Mr. Krafchick's mental status at the time of the offense.

**Sources of Information:** Clinical interview with Mr. Steven Krafchick; Review of medical records from Christiana Care Health Services (dated January 24th, 2001); review of Secondary School Records; review of Family Court of New Castle County Records (various); review of treatment records Child, Inc.; review of medical records from Correctional Medical Services (various); Criminal History Record; Affidavit of Probable Cause; Substance Abuse Evaluation; Minnesota Multiphasic Personality Inventory-II (MMPI-II)

**Background Information:** Mr. Krafchick is a 36 year old, Caucasian male who has been incarcerated at the Multi-Purpose Criminal Justice Facility at Gander Hill since his arrest on January 15, 2001.

Mr. Krafchick is accused of killing his wife, Dawn, during an argument at their previous workplace, the Manor Family Restaurant, in January of this year. According to Mr. Krafchick, he has no memory of killing his wife. According to the paramedic report, Mr. Krafchick was unresponsive and unable to be awakened when they arrived on the scene. Mr. Krafchick remembers waking up in the hospital some time later after having surgery. He was taken to the hospital and treated for a self-inflicted stab wound to his wrist and hand in an apparent suicide attempt.

According to the Police record, on the morning of January 15, 2001, Mr. & Mrs. Krafchick arrived for work together at the restaurant. After entering the restaurant, an argument ensued which became a physical fight. The two fought their way into the kitchen where Mr. Krafchick stabbed his wife to death before turning the weapon on himself. A customer in the restaurant subdued him at that time. The police and emergency medical personnel were summoned.

1

After receiving medical treatment, Mr. Krafchick was transferred to the Multi-purpose Criminal Justice Facility at Gander Hill and placed on 24-hour suicide watch to protect him from further harm to himself. Mr. Krafchick was evaluated by a psychiatrist who described him as: tearful, anxious, and irritable, with anhedonia (the inability to feel or experience pleasure). He was prescribed Paxil 20 mg. and Tranzadone 400 mg. @ h.s. for depressive symptoms. He has continued on medication throughout the time of his incarceration.

Mr. Krafchick reported that he had known his wife, Dawn, for the past 21 years. They had been married for 17 & ½ years. There are two children from this marriage, Renee, age 17, and Michelle, age 12. Their marriage was always tumultuous characterized by severe conflicts brought about by shared drug dependencies. These drug dependencies resulted in repeated separations and reconciliation, financial problems leading to loss of residence, and loss of custody of their children. According to Family Court Records, in October 1998, Hilda Wilson, Dawn's mother, petitioned the Court for full custody of the children. Mrs. Wilson charged that Steven and Dawn Krafchick were not able to provide adequate care for the children because of their unstable housing, lack of food in the home, and drug involvement. The Court determined that it was in the best interest of the children to be in the care and custody of their maternal grandmother. The children have lived with their grandmother since that time. According to Mr. Krafchick, he had had limited contact with his daughters since they moved in with their grandmother.

Mr. Krafchick is the youngest child in a family of two children. Mr. Krafchick's father died when he was 8 years old from carbon monoxide poisoning. Mr. Krafchick reported that his father's death was very traumatic for him. Following his father's death, his older brother, two years his senior, began picking on him, beating him up and embarrassing him in front of his peers. He stated that he told his mother who tried to intervene. However, she was unable to deter his older brother from continued abuse. Mrs. Krafchick remarried a neighbor. Mr. Krafchick stated that he was very fond of his stepfather until his death from a heart attack. Mr. Krafchick reported that he has always maintained a close relationship with his mother often talking with her about his marital problems.

Mr. Krafchick withdrew from high school at age 16. According to his high school record, he failed 9th grade and then dropped out of school in 10th grade when Dawn became pregnant. He was identified as a special education student and always had trouble academically.

Mr. Krafchick's work record reveals a history of low paying jobs, including truck driver, restaurant worker, machine operator, construction worker, and laborer. The most money he ever earned was approximately $1000.00 per week. Mr. Krafchick stated that he has been fired from several jobs for repeated lateness or absenteeism.

Mr. Krafchick's legal history includes charges processed in the Family Court of New Castle County, mostly for domestic problems. These charges include: failure to pay fines and costs, Assault, Offensive Touching, and Terrorist Threatening. Some of these charges have resulted in various Protection from Abuse (PFA) orders against Mr. Krafchick. A review of the Family Court record indicated that many of the PFAs were subsequently revoked or withdrawn by Mrs. Krafchick. In fact, at the time of Mrs. Krafchick's death, there was a PFA order in place against Mr. Krafchick. However,

2

according to Mr. Sayn, owner of the restaurant where both Mr. & Mrs. Krafchick worked, they frequently came to work together in the same car and had done so on the day of Mrs. Krafchick's death.

Mr. Krafchick's medical history reveals near sightedness, arthritis, and chronic low back pain. In the 1980s, he suffered a ruptured colon and was forced to wear a colostomy for approximately 6 months. The colostomy was eventually reversed. On January 15, 2001, Mr. Krafchick suffered a self-inflicted laceration to his hand after allegedly stabbing Mrs. Krafchick. He was evaluated and treated in the emergency and surgical departments of Christiana Care. According to the medical record, the injury caused serious nerve and artery damage. Following the surgery, Mr. Krafchick underwent Physical Therapy to strengthen and regain mobility in his hand. It appears that there may be some lasting damage. Since his incarceration, his complaints include persistent nausea and vomiting, numbness in his left hand, and severe headaches. He denied any allergies.

**Behavioral Observations:** Mr. Krafchick is a Caucasian male, standing 5'11" tall and weighing approximately 210 lbs., who appeared his stated age, who was assessed on three separate occasions at the Multi-Purpose Criminal Justice Facility at Gander Hill. During each session, Mr. Krafchick was dressed in standard Department of Correction attire. His appearance was slightly disheveled and his hair unkempt. He had several large scars on his hand related to recent surgeries.

During each session, Mr. Krafchick was very deliberate in answering questions presented to him. He took a very long time relating information to this examiner. He had difficulty organizing his thoughts and conveying them to me in a cogent manner. Further, he was visibly anxious throughout the interviews. His speech was pressured, of low volume, and monotone. Sometimes, he was shaking. He cried several times throughout the interview.

Mr. Krafchick's mood appeared depressed with accompanying affect. He reported feelings of anhedonia (the inability to experience pleasure even when engaged in previously pleasurable activities). He complained of sleep disturbance with resulting fatigue (interrupted sleep and early morning waking). His appetite has been poor. His outlook was hopeless. He was self-depreciative in his verbalizations but appeared genuinely remorseful. He admitted to past suicidal ideation with at least one attempt. Currently, he experiences intermittent suicidal ideation, although at the time of this evaluation he did not have a plan to kill himself.

Mr. Krafchick's memory was spotty. Although he could generally recall autobiographical information, he was unable to recall a significant event in his life, most notably, stabbing Mrs. Krafchick. Also, he admitted to having had repeated "blackouts", or periods of amnesia, associated with alcohol and other drug intoxication.

Mr. Krafchick's other cognitive processes were also impaired as evidenced by cognitive slowing, mild mental confusion, and verbal expression difficulties (all consistent with individuals suffering from depression).

Mr. Krafchick's sensory and perceptual processes were grossly intact with the exception of diminished grip strength, a result of recent hand injury and surgery.

3

Based upon Mr. Krafchick's participation in the interview and testing as well as collateral information obtained from other sources, the results of this evaluation appear to be an accurate representation of his typical functioning.

**Intellectual Functioning:**  Although a formal evaluation of intelligence was not completed as part of this evaluation, based upon background information, work history, and presentation, Mr. Krafchick is presumed to be functioning in the Borderline to Low Average range of intelligence. He reported multiple academic difficulties and classification as a Special Education student. He failed 7th grade twice and 9th grade before dropping out of school. His vocabulary, problem-solving skills, and abstract reasoning skills are consistent with individuals in this range of intellectual functioning.

**Substance Use Evaluation:** Mr. Krafchick has an extensive history of drug and alcohol related problems beginning in adolescence. Mr. Krafchick started smoking marijuana at age 13-14 in the 8th grade. Between the ages of 14-21, he smoked marijuana everyday, often consuming 4-5 "joints" alone or with several peers. He reported typical intoxicating effects from marijuana in that it made him feel more relaxed. He also reported that he had a heightened sense of humor and increased appetite after smoking. He stated that he stopped smoking marijuana on a regular basis at approximately age 21.

Mr. Krafchick also reported smoking Phencyclidine (PCP), alone and in combination with marijuana use. He reported severe sensory and perceptual distortions typically associated with PCP intoxication. During the time he abused PCP, he reported tunnel vision, time distortions, diminished awareness of his surroundings, and feeling like he was "floating" above the earth.

Mr. Krafchick reported taking hallucinogens, including both LSD and Psilocybin mushrooms, approximately 15-20 times in his life. While under the influence of hallucinogens, he reported typical intoxicating effects including severe visual hallucinations and heightened sensory and perceptual experiences. He admitted to having had one "bad trip" in adolescence, the last time he used LSD.

Mr. Krafchick reported abusing amphetamines, including pills and methamphetamine (crystal meth), a potent amphetamine, which typically comes as a powder. He stated that between the ages of 21-25, he regularly abused "crystal meth", both intra-nasally and intravenously.

Mr. Krafchick ultimately developed a serious dependence on cocaine. He initially tried cocaine in high school, at around age 15. By age 18, he became a regular user of cocaine. He frequently sold cocaine in an effort to support his and Dawn's habits. Between the ages of 18 and up until the time of his arrest in January 2001, he intermittently used cocaine. For long periods, he abused cocaine daily, often consuming up to ¼ of an ounce of cocaine (valued at approximately $150.00) per day. Both he and Dawn regularly abused cocaine together. As previously mentioned, their cocaine use resulted in their losing money, homes, vehicles, and eventually their children. Mr. Krafchick reported that both he and Dawn frequently made promises to one another to quit. Occasionally, they succeeded for brief periods of time only to relapse and return to addictive use. As is typical of cocaine addicts, Mr. Krafchick and Dawn used the drug compulsively, meaning that once they started they could not stop until all of their current resources for getting the drug were exhausted. As indicated previously, cocaine held

4

such a powerful grip on both of them that both were willing to sacrifice everything, even custody of their children, for cocaine.

Long-term, chronic, cocaine dependence typically results in serious psychological problems and can create permanent personality changes in individuals, lasting beyond periods of intoxication. Specifically, cocaine addicts become overly suspicious, a personality characteristic displayed by Mr. Krafchick, particularly in regard to his marriage to Dawn. In the months leading up to Dawn's death, Mr. Krafchick believed that his wife was sleeping with other men to share cocaine with them. He actually found Dawn at the home of another cocaine user. According to Mr. Krafchick, Dawn denied any extramarital involvement.

Mr. & Mrs. Krafchick had displayed aggressive behavior toward each other over the years. Aggressive behavior is another common behavior displayed by cocaine addicts. At times, these aggressive interactions resulted in Mrs. Krafchick seeking protection from the police or the Family Court. However, even after sanctions were imposed, Mrs. Krafchick ignored them, choosing to associate and even live with Mr. Krafchick, or "drop the charges or PFAs" after they had been filed. This behavior is typical of couples caught up in a cycle of addiction. They often tolerate extreme abuse from one another, e.g. violence, infidelity, etc., and remain with one another, perpetuating the cycle of abuse over and over again.

Individuals with chronic cocaine dependence will repeatedly compromise their values and behave in immoral ways to continue using cocaine. Often, they feel tremendously remorseful after behaving immorally while using cocaine. People can also experience memory loss or "blackouts" while under the influence of cocaine. This of course is exacerbated when individuals use cocaine in combination with other drugs or alcohol as is frequently done and was the practice of Mr. Krafchick.

Mr. Krafchick has been an alcoholic and drug addict since the age of 17-18. Although he occasionally attempted to stop using a particular drug, at no time in his life was he completely clean and sober from all drugs and alcohol for any extended period of time. It is clear that his addictions, as well as Mrs. Krafchick's addictions, resulted in multiple and serious problems in their lives. They constantly had financial problems having lost homes, cars, and other possessions due to drugs; were often violent with one another; they made repeated promises to one another to change but failed to follow through with any significant change in their behaviors; and they lost their children. In fact, on the day of the Family Court hearing to determine custody, neither Mr. nor Mrs. Krafchick appeared in Court.

**Personality**: Mr. Krafchick is currently experiencing a major depressive episode. He is displaying typical signs of depression including depressed mood, generalized anxiety, fatigue and lack of energy, mental confusion, sleep disturbance, excessive guilt and feelings of unworthiness, and intermittent suicidal ideation with a recent attempt (January 2001). He is preoccupied, ruminating over problems in his life including his wife's death, other losses he has experienced (deaths of father and stepfather and estrangement from children) and physical illness. He harbors strong feelings of unworthiness, low self-esteem, and hopelessness. These feelings, although exacerbated since his incarceration, were present for many months leading up to the stabbing.

5

Mr. Krafchick's depression results in feelings of discouragement and a hopeless outlook about the future. He feels strong regrets regarding his family life and the overwhelming costs of his addictions. His hopelessness is pervasive leading him to believe he is a condemned man.

Mr. Krafchick is passive and dependent by nature. Mostly, he fears being alone, feeling unable to manage his life effectively without the constant attention from others. He had difficulty dealing with conflict with others because he feared losing support or approval from them. At times, however, and mostly attributed to alcohol and drug use, both he and Dawn became aggressive and violent toward one another. Even passive people are prone to aggression while under the influence of drugs and especially during sustained relationships fraught with drug addiction. In the months leading up to the stabbing, Mr. and Mrs. Krafchick's marital strife worsened. When together, they shared drugs but talked of getting treatment as they had done many times previously. When separated, Mr. Krafchick believed that Mrs. Krafchick was unfaithful and eventually found her sharing drugs with other men. Mr. Krafchick desperately sought to reconcile with Dawn. He enlisted the support of his oldest daughter to help him. In the days leading up to her death, Mrs. Krafchick apparently had made plans to leave the area. Mr. Krafchick and his daughter, Renee, found her at a bus stop with luggage. He had Renee plead with her not to go. He maintained hope that he and Dawn would reconcile.

Mr. Krafchick is expressing a large number of somatic complaints. Some of these complaints are obviously physically based (hand injury) while others may be a function of the acute stress he is experiencing. Mr. Krafchick is likely to express his anxiety in physical complaints and is more willing to accept physical explanations for his discomfort rather than psychological ones. This may be an unconscious "defensive" posture at the present time in an effort to "protect" himself from the overwhelming and possibly fatal effect of truly acknowledging and accepting the reality of his circumstance.

Like many victims of trauma, Mr. Krafchick remains disconnected from the harsh reality of January 15, 2001. He was in such a heightened state of distress in the months leading up to the stabbing, that his thinking and judgment were severely compromised. Given his limited intellectual capacity, lack of psychological sophistication, and long history of chronic addiction, he was unable to identify the severe nature of his problems and seek help. Unfortunately, a conflict in the restaurant, probably similar to countless other conflicts in this marriage over the years, resulted in a fatality. He remains psychologically disconnected from this tragedy, as it is too overwhelming for him to accept.

**Summary and Recommendations:**

Mr. Krafchick's pattern of symptoms support the following diagnoses:

Axis I:   Major Depressive Disorder, Severe, Without Psychotic Features
          (296.33)
          Polysubstance Dependence (304.80)
          Somatization Disorder (300.81)
          Generalized Anxiety Disorder (300.02)
Axis II:  Dependent Personality Disorder (301.6)
Axis III: Colon Surgery, multiple somatic complaints (By history)

6

Axis IV: Severe and Enduring-Legal Problems, Medical Problems, Family Problems
Axis V:  35

Mr. Krafchik suffers from a number of mental illnesses that substantially alter his thinking and behavior. Although his personality disorder has likely been present since early adulthood, the depression and anxiety disorders were caused by the stress he experienced anticipating that his marriage was once again failing. Consequently, at the time of the stabbing, Mr. Krafchick's psychiatric illnesses coupled with the distress he was experiencing, substantially affected his thinking, his feeling and his behavior, and were so impairing that he was not aware of the consequences of his acts. Therefore, this action can only be viewed as one caused by extreme emotional distress.

Mr. & Mrs. Krafchick were unable to effectively manage their lives together throughout their marriage. As mentioned previously, they lost homes and custody of their children because of their lifestyle. However, even these losses coupled with orders from the Family Court, could not deter them from staying together. This perverse attraction on both of their parts led to Mr. Krafchick's inability to tolerate being separated from Mrs. Krafchick.

It is also important to consider the impact of Mr. & Mrs. Krafchick's lives on their children. Both Renee and Michelle (daughters) have likely endured unbelievable neglect over the years while living with their parents, either together or alone. It was not until their grandmother petitioned the Court for custody that the girls had a chance for a more normal, orderly, and predictable life. Now, their mother gone, their father incarcerated for the killing, they are faced with the prospect of losing their father forever. It is in the best interest of these children to consider the already monumental losses they have endured when considering sentencing for Mr. Krafchick.

Mr. Krafchick's current symptoms will not abate in the near future. Personality Disorders as well as addictions are enduring by nature. While individuals can overcome depression and anxiety, given Mr. Krafchick's personality style and limited resources, it is unlikely that he will ever be fully free of psychological problems. Therefore, continued psychiatric treatment including medication will be required in the future to address some of his symptoms.

Mandell J. Much, Ph.D., DABPS
Licensed Psychologist
Diplomate, Forensic Psychology
Substance Abuse Psychology

**CHRISTIANA PSYCHIATRIC SERVICES**

SUITE 124
MEDICAL ARTS PAVILION
4745 OGLETOWN-STANTON ROAD
NEWARK, DELAWARE 19713

CAROL A. TAVANI, M.D., F.A.P.A.
Diplomate, American Board of
Psychiatry & Neurology

Adult and Consultation Psychiatry
Telephone (302) 454-9900

The following is the psychiatric evaluation of Steven W. Krafchick. I evaluated Mr. Krafchick at Gander Hill Prison (the Multi-Purpose Criminal Justice Facility) on December 21, 2001, for two hours, forty five minutes.

This thirty-six year old white, now-widowed male is charged with first degree murder in the January 15, 2001 stabbing death of his wife, Dawn. My understanding is that this occurred at the restaurant where they had both worked, in plain view of the restaurant's occupants, and that Mrs. Krafchick was stabbed some thirty six times, with the knife remaining in her body.

The purpose of this evaluation was to determine Mr. Krafchick's mental status at the time of the incident, to elucidate his psychiatric diagnosis as well as factors affecting his state of mind and behavior at the time.

In preparation for the interview I reviewed the following records:

Psychoforensic evaluation of Mandell J. Much, Ph.D.;
Report of David E. Raskin, M.D.;
Medical Records of Correctional Medical Services;
Medical Records of Christiana Care Health Systems of January 15-18, 2001;
Report card from Delcastle Technical High School, 1980-1981;
Family Court Records, 1991 to 1998;
Order for Custody of 10/29/98;
Affidavit from Child, Inc. of Mr. Krafchick's participation, 6/27/97-3/9/98;
Affidavit of Probable Cause, State of Delaware v. Steven W. Krafchick.

**PAST MEDICAL HISTORY:**

His primary physician is Dr. Mark Glassner, whom he does not see regularly.

Cigarettes: One half pack per day.

12/31/2001 02:49    3024255708    THOMAS MIESZALA    PAGE 02

-2-

Alcohol: began at age ten, while under supervision of his older brother and his friends. By age fifteen, he was drinking a case of beer a day, but diminished at about nineteen. For a long period he did not drink to excess or even daily, but had restarted daily and heavily in late December of 2001.

Drug abuse history is extensive. He began at age ten, with marijuana, again with his brother. Next came amphetamines, at age twelve, which he used daily, for about three years. Then came cocaine, which has been the major drug of abuse over the years. There had also been some use of intravenous crank (amphetamine), then cocaine, with no sharing of needles.
There had been occasional use of miscellaneous drugs in the remote past, including hallucinogens perhaps twenty times, with some adverse experiences ("bad trips").
There is history of several blackouts; he once had no recollection of having repaired their truck.
The crack cocaine dependence, however, was a severe problem, shared with his wife over the years, with shared usage in the three to four hundred dollar a day range. There was a period of sobriety from 12/20 to 1/14/2001, at which time he was trying to turn himself around.

Chronic back pain, secondary to work-related injury as a mover.
Carpal Tunnel Syndrome bilaterally.
Osteoarthritis in fingers, wrists, knees, and ankles.
Head injury at five (hit by a rock), without loss of consciousness; and at eleven (accident at school), with loss of consciousness.
Another head injury with loss of consciousness occurred when he was assaulted 2/1/97. H
Colonic perforation, requiring colostomy in 1984; this was subsequently reversed.
Self-inflicted stab wound to left wrist 1/15/01, with damage to several flexor tendons (flexor digitorum superficialis 4 and 5 and flexor carpi ulnaris and palmaris longus), requiring repair, and laceration of the ulnar nerve and artery, which also required surgical repair.
Superficial laceration to the right groin, in the same episode.
Intubation in ER on same date, due to unresponsiveness at the scene and no reaction except to deep pain.

## PSYCHIATRIC HISTORY:

There is significant history of depression, dating back to childhood; his father had died tragically, by accidental carbon monoxide poisoning when he was eight. He had tried to deal with his father's death, but could not, and so his mother took him for counselling to Delaware Children's Services, on Delaware Avenue. He had not been getting along with his teachers in school, and was acting out, not going to school, and drinking or using

-3-

marijuana. He liked going to the therapist, and felt that it helped, at least a little. He was in counselling for almost two years. He did not receive any medications by his recollection. He feels that he has never put this loss, exacerbated by subsequent losses, to rest. He admits to having had suicidal ideation at times in the past.

His next psychiatric encounter was a six to eight month period when he went with his wife and family to Newark Family Counselling. There were serious financial problems because of their drug abuse, and this had led to marital problems. Dawn tended not to keep her appointments, but he continued to go, and paid out of pocket for much of the time.

In 1997-1998 he was remanded to Child, Inc. Anger Management classes. He tells me that Dawn told a Family Court Judge that his anger was uncontrollable, so he was court-ordered. He admits to having pushed her, but never their children.

Also in 1998 they both went to NET Counselling, for about a month, which did not result in sobriety.

**SOCIAL HISTORY:**

He grew up in Stanton, the youngest of three children. His father was a line worker at General Motors, and is described as a functional alcoholic (a case of beer daily), as was his paternal grandfather. He and his father were very close. His mother is a homemaker, and he is close with her as well.

When he was eight, his father and his uncle were working on a car; they had rigged up an exhaust system in the garage, but it was insufficient, and both suffered asphyxiation. The uncle's daughter found the two. The family arrived as the ambulance was just leaving. His uncle suffered brain damage, but survived. His father did not.

His sister, Judy, is four years older. She is divorced and has one child. Judy lives with their mother, who is now 66, owns her own home in Stanton, and is in good health.

His brother, John, is two years older. John is a bus driver for Ryder. He, too, is divorced with one child. He lives alone in an apartment in Newport. John is an alcoholic, and is still drinking. He has a significant past history of drug abuse, which he was able to stop, but became a heavy drinker after his divorce. John, too, has suffered from significant depression, but has not ever gotten any help with it.

-4-

After their father's death, John became physically aggressive toward Steven, as well as demeaning in front of his peers. Steven did tell his mother, who tried to intervene, but unsuccessfully.

After their father's death, both sets of grandparents helped out, and their mother did receive benefits, so they were able to stay in their home. He describes a stable environments, with pets, and some happy recollections.

Their mother remarried two and a half years later. He came to like his stepfather, who was a supervisor for ConRail, in the freightyard. He is described as a second father to Steven. This man died of a sudden cardiac demise when Steven was sixteen, an event described as an additive trauma, with resurgence of all the pain from the first loss, and he coped by escalating his drug use.

**Educational History:**

He was in Special Education classes from fifth or sixth grade on, for math, spelling, reading and English, to the best of his recollection (which is hazy on this). Even with this extra help, he failed seventh grade twice.

In ninth grade, he was asked to leave school; his attendance was poor, and he was caught with drugs on more than one occasion. There was no history of fights, firesetting, or other aberrant behavior.

He never earned a GED; he did go to the Grove School for half a semester, but found it too difficult to work and attend classes at the same time.

**Work History:**

His first job was at a sub shop at age thirteen, for about a year. He then worked as a carpenter's assistant for three years. He and a coworker quit that job over what he described as an inhumane work situation, and he then worked as a mover for Lane. He worked with Mr. Lane from age sixteen until two years ago. There was one four year span wherein he worked there steadily, and the rest was intermittent. In between, he drove a truck for Bear Delivery.

He admits having been fired a few times for lateness and absences, because of drugs, but has always managed to find work of one sort or other. He has also worked as a mechanic, a pizza delivery man, and three years ago as a waiter.

At the time of the incident, he had just quit his job at the Manor Family Restaurant, over comments made by the owner, R.J.Swann, which were antagonistic; he reports that Mr.

12/31/2001  02:49    3024255708              THOMAS MIESZALA                    PAGE  05

-5-

Swann told him that he should have realized that Dawn, who also worked there as a waitress, was being unfaithful.

### Family History:

He met Dawn when he was fifteen and she was fourteen, and living in the apartment complex across the street. Dawn was the first person with whom he was intimate.
In their teens, he was unfaithful, and they broke up for one year. They got back together when he was sixteen, and have been together since (twenty one years).

They married in 1984. He was never unfaithful thereafter, and does not feel that she ever was until the Summer of 2000, when he (actually, the police) found her in a motel with a waiter, Michael.
He tells me that they were due in Family Court for a custody hearing that day. He could not find her, and became frantic; he filed a missing persons report, and the police found their truck at the motel where Michael was, and Dawn inside. Dawn had a capias at the time, and went to BWCI from there.

There are two children: Renee, 18 and Michele, 12. The Krafchicks lost custody of the girls in 1998 because Renee herself recognized the environment as unstable, and asked her maternal grandmother, Hilda Wilson, to come and get them. Mrs. Wilson and her husband took the children, against their parents' resistance, and her husband called the police.
Michele is still in counselling, but Renee is no longer.

Their family life has been chronically and severely dysfunctional, related to the longstanding, shared history of drug abuse and its sequelae. There have been numerous evictions for inability to pay the rent or mortgage. They lost all of their furniture, which was in storage. They lost a brand new car. They were evicted from five motels. They lost their children.
They would argue, pushing and shoving each other. They became desperate enough that they both sold drugs. Dawn would seek Protection from Abuse orders, then ignore them; there was actually one in place at the time of the incident, yet they were together and he had driven her to work that day, and they had planned to seek rehabilitation together that day.

On December 20, he was arrested on a domestic abuse charge. They had been living in a motel, and had been up most of the night. Dawn went out to work and it had snowed. He recalls that she had missed the bus and come back in. He had gone back to sleep. He was next awakened by the police and a K-9 officer, and was arrested for abuse, with no idea why. He was then bailed out by his boss.

-6-

On the 24th, she came to work, and they talked. He respected her statement that she needed some time to be alone, but she then asked him to spend Christmas together, with the girls, which he did, at his mother's, but Dawn never showed up, despite her request -- and also did not show up for work.

After that, his daughter Renee was driving him to his probation appointment, when they saw Dawn across the street. She got into the car with them, and there was some arguing, but he went to his appointment.

He later found out she was with another man, Chuck, from December 20 to 27, and with whom she eventually admitted an affair.

**Legal History:**

Family Court records dating back to 1991 reveal a number of petitions for protection from abuse, many of which were then dismissed or withdrawn. This is consistent with his report that Dawn would become angry, file them, and then seek to undo them. There were associated charges of offensive touching, assault, and terroristic threatening.

**Events Leading to the Incident:**

Mr. Krafchick explains that he and his wife were living together at Lincoln House Apartments since the Friday before the incident (prior to that, he had been staying with coworkers from the restaurant, and she had been at a shelter in Brandywine Hundred). They got up, took a shower, and she made a phone call to Chuck to tell him to leave her alone.

The night before the incident, she was supposed to pick him up at work at eleven. However, he had had words with their boss, as described above, and walked out at 7:30. He walked to the apartment, and she was not there. She had told him she was going to the store when he had left at three. He got a ride from Rock, the man next door to Pathmark, to look for her. His neighbors told him that she might be at the motel again, and so he asked Rock to swing by Chuck's motel first, and indeed there was the car. He knocked on the door, and Chuck denied that she was there, but the motel manager intervened for him, and she was indeed there. She told him she was there to get high; he had not had cocaine for 25 days, but told her if she wanted to get high they would go get drugs together. At that point she left with him in his car, they got drugs in Wilmington, and went to his apartment. She asked him to get more, and he did. On his return, she asked him to make love. Afterwards, they talked about the future, and how much they had lost. It was at that

-7-

point that she admitted having had an affair with Chuck, but told him he wouldn't understand why.

They stayed up and talked until 4 AM, and were using crack to that point. They decided to go to the Drug Rehab on Kirkwood Highway; if work wasn't busy, they would leave early and go directly.

She was due in at ten, and he drove her. He waited inside for her, to see if they were going to the rehab then. She was equivocating, and he got upset, and loud, and asked "are we going to rehab or not?" She said yes, and went into the next room to get her coat. However, she then told the manager, Adam, to tell him to leave, that she wasn't going with him.

The next thing he recalls is waking up in the hospital. He heard the nurses and two officers talking. The Channel Six News was on, and he heard that Dawn was dead.

## MENTAL STATUS EXAMINATION:

revealed a pleasant, cooperative man appearing his stated age. He was easily and frequently tearful, and used up a sizable supply of tissues I had with me. His mood was anxious, distressed, and depressed. Affect was appropriate to ideation. His greatest upset was over the loss of his wife. Speech was coherent, relevant, and goal-directed, without evidence of psychosis; I did not detect paranoia, given the context that his suspicions were confirmed.

He evidenced numerous neurovegetative depressive symptoms, including a very low mood most of the time, poor appetite, insomnia, and somewhat impaired concentration. He has intermittent suicidal ideation, but no intent. He feels able to read reasonably well, and is trying to read materials in the Law Library. He reads the newspaper when available.

He tells me that after he was incarcerated, he was placed on Paxil and Trazodone, but had an adverse reaction, with nausea and dizziness. He was then switched to Sinequan and Vistaril, which has been better, and with this he is getting about three hours of sleep. His mood, however, is no better.

In terms of cognitive function, he gave his history as above, with good recall for most remote and recent events in general although with some exceptions. He was fully oriented, but could only recall portions of three complex objects after five minutes. He was unable to do any serial subtractions correctly, although he did try repeatedly. There was some confabulation in his short term recall responses, with his filling in the gaps with what he thought must be a correct response.

-8-

When I probed into his recall of the altercation in the restaurant and what followed, he had absolutely no recall other than what is described above. This is entirely consistent with the trauma flowsheet in his medical records; the Paramedic Report documents that he was unresponsive at the scene, unable to be awakened. BLS was dispatched at 10:24 and arrived in two minutes, at 10:26. They described him as obtunded, as did the second unit to respond at 10:36. Once in the ER (he arrived at 10:55), he is described as unresponsive except for some movement to deep pain and in fact he required a breathing tube and was actually intubated in the ER at 11:15. He was admitted to the Intensive Care Unit, then went rather emergently to the Operating Room.

Insight was uneven, with a persistent mentality of one who has had a longstanding addiction. He has insight into his depression and its genesis. He did draw a connection at times between the drug use and self-medication of his pain. Judgment at this time appears intact.

## DIAGNOSTIC IMPRESSIONS:

Axis I:

1. Major depression, single episode but longstanding, without psychotic features.
2. Dysthymic Disorder.
3. Substance-induced mood disorder
4. Persistent substance-induced cognitive disorder.
5. Learning Disorder, NOS
6. Cocaine dependence
7. Alcohol abuse, intermittent
8. History of mixed substance abuse in past
9. Acute Stress Reaction

Axis II: Personality Disorder, with inadequate and dependent features.

## DISCUSSION:

This individual experienced an early loss, which was traumatic and recapitulated later on, in his teens, by a subsequent, similar loss. He never fully recovered from this, and his coping mechanisms in general do not facilitate recovery from such events.
The same dependence which made the early parental losses so difficult also was operative in keeping him tied in to (and codependent in) a severely pathologic relationship which was counterproductive to both partners as well as to their children.

12/31/2001  02:49  3024255708    THOMAS MIESZALA    PAGE 09

-9-

Aside from the counselling he had as a child, his depression was never really identified or addressed, and his major method of coping with his pain was self-medication with drugs and/or alcohol. Thus was incepted the establishment of a vicious cycle of dual diagnosis, which was never successfully interrupted.

With regard to the precipitants of his attack on his wife, the following may be said. He broke his own twenty-five day, unprecedented abstinence from cocaine, his "drug of choice" in order to wrest his wife away from another man, to whom she had clearly turned to seek drugs.

In the course of relapsing with her that very night, he heard her admission of sexual infidelity with this man.

Despite this, he was resolved to seek help together with her.

When she backed out of this plan, what he saw was the dissolution of his last hope of a fresh start for his life, his relationship with her, and of reclaiming his family. All that they had identified as having lost once was suddenly lost again, and forever. Her refusal to go with him was unbearable to him, and he saw himself sinking into emotional quicksand. Given this, he snapped, and dissociated.

His symptoms and behavior best fit the DSM-IV description of an Acute Stress Reaction or Disorder, given the trauma of the event, his intense sense of frustration, fear and helplessness, and then the reactive detachment and dissociation with dissociative amnesia.

He continues to experience acute distress upon being reminded of the events, and had marked symptoms of that distress (insomnia, trouble concentrating, irritability) still. His symptoms are multiply determined; i.e., these symptoms also overlap with those of a depressive disorder, but the degree of unresponsiveness documented by three sets of objective observers (two paramedic teams and the ER staff) is best explained by a dissociative episode.

In extrapolating psychiatric diagnoses into legal terminology, it can be said that the circumstances which occurred were so overwhelming as to have rendered him deaf to the voice of reason, and that his degree of upset precipitated by the admission of infidelity, the coercion into cocaine relapse, then finally the refusal of his codependent to go with him together to what he saw as a last chance for salvation, resulted in a frenzy of mind. I asked him a McNaughton-like question, in the form of were a policeman to have come into the restaurant and been sitting at the counter, would this still have happened. His response indicated that he was essentially so out of touch at the time that unless someone had physically intervened, he was not able to exercise any sort of self-intervention. He has no recall of where the knife came from, what it looked like, or any other details of the incident, including any intent to harm his wife.

-10-

This response would likely have occurred even absent the cocaine. I say this based on his dependent features, the rejection and massive insult which had just come to the fore, and the degree of desperation operative at the time.

The above is stated to a reasonable degree of medical certainty.

If there are any questions, please do not hesitate to call.

*CA Tavani, M.D. 12/29/01*

Carol A. Tavani, M.D., M.S., F.A.P.A.

CORRECTIONAL MEDICAL SERVICES, Inc.          PHYSICIANS' ORDERS

Name __Steven Kratchick__                    D.O.B. _____

Location _____       ID# _____    Allergies _____

| Check box as order is noted | Date & Time |
|---|---|
| Noted by: BOffeePell  Date: 2/5/01  Time: 2100 | Paxil 30 mg po qhs × 90 Days<br>Trazodone 100 mg po qhs × 90 Days<br>TSH |
| | M.D. Signature _Wo Keer_ ms  Date/Time 2/5/01  4pm |

| Check box as order is noted | Date & Time |
|---|---|
| Noted by 2100  M/2/01  Date:  Time: Roberts RN | 1) A Sinequan 125mg p.o qhs × 90days.<br>2) No Paxil or other antidepress.<br>3) Return to MH clinic in 12 weeks. ✓ 9/24/01 |
| | M.D. Signature _X HO_  Date/Time 7-2-01/2 pm |

| Check box as order is noted | Date & Time |
|---|---|
| Noted by: Karen Stauff RN  Date: 7/7/01  Time: 1550 | ↑ Sinequan 150mg po qhs<br>Vistaril 20g i² PRN for Anxiety |
| | M.D. Signature _____  Date/Time 7/6/01 |

| Check box as order is noted | Date & Time |
|---|---|
| Noted by Dunham N  Date: 9/26/01  Time: 0330 | Tylenol 650mg po TID × 30 Days |
| | M.D. Signature _____  Date/Time 9/24/01 |

A-3

CORRECTIONAL MEDICAL SERVICES, Inc.        PHYSICIANS' ORDERS

Name Steve Krafchick                     D.O.B. 1-6-65

Location 2A                    ID# 178856  Allergies Denied

| Check box as order is noted: | (Date & Time) |
|---|---|
| Noted by:<br><br>Date:<br>Time: | Sinequan 100 mg po ghs X 180 Days<br><br><br><br>Wokoul MD 3/18/01<br>M.D. Signature                    Date/Time |
| Noted by:<br><br>Date:<br>Time: | pl- Schedul 1/w for F/, ū Dr. DANYO.<br>Consultation form filled out<br><br><br><br>M.D. Signature              Date/Time  4-20-01 |
| Noted by:<br><br>Date:<br>Time: | Tylenol 650mg po TBX 30 days<br><br><br><br>M.D. Signature              Date/Time  5/0/01 |
| Noted by:<br><br>Date: 5/4/01<br>Time: 13⁵⁰ | (1) PHYSICAL THERAPY o/ Splint (2) c/th 5th finger<br>2nd & 3rd finger passive & Active RoM Therapy<br>Consultation form filled out<br>(2) F/U ē Dr. Joseph Danyo → 6wk<br>(consult form filled out)<br>M.D. Signature   RAS-b        Date/Time  5-4-01 |

**A-4**

# CORRECTIONAL MEDICAL SERVICES

PHYSICIANS' ORDERS



NAME Krafchick, Steven
D.O.B. 1-6-65
LOCATION GH
ALLERGIES PKOOL

**Start (Date & Time)** 10/1/0

Sinequan 50 mg poam
150 mg po 2 hs
Vistaril 50 mg po 12° PRN
for Anxiety

Dispense As Written _____ M.D.
Substitution Permitted _____ M.D.

---

NAME Krafchick, Steven
D.O.B. _____
LOCATION _____
ALLERGIES _____

**Start (Date & Time)** 1/3/02

Sinequan 50 mg poam
150 mg PM
Vistaril 50 mg po q6 12°

Dispense As Written _____ M.D.
Substitution Permitted _____ M.D.

---

NAME Krafchick Steven
D.O.B. 1-8-65
LOCATION Inf N/KA
ALLERGIES
Noted 2-14-02 1130
B. Bradley RN

**Start (Date & Time)** 2/14/02

Δ Vistaril 50 mg po q8 PRN
for Anxiety

Dispense As Written _____ M.D.
Substitution Permitted _____ M.D.

---

NAME Krafchick Steve
D.O.B. 1-6-65
LOCATION Inf
ALLERGIES N/KA
Noted 2-18-02 1050
B. Bradley RN

**Start (Date & Time)** 2/18/02

D/C level III
and keep Inf for one Mu day

Dispense As Written _____ M.D.
Substitution Permitted _____ M.D.

---

NAME _____
D.O.B. _____
LOCATION _____
ALLERGIES _____

**Start (Date & Time)**

Dispense As Written _____ M.D.

A-5

IS 7116 1054

**Bipolar Treatment**
Residential Treatment for Adults with
Psychological Problems

**Bipolar Mental Illness**
How To Identify, Handle & Deal With Bipolar
Disorder. Secrets Revealed.

Ads by Goooooogle

**PDR** *health*

disease overviews    health and wellness    drug information    clinical trials    product info & offers

search

*Brand name:*

# Sinequan

*Pronounced: SIN-uh-kwan*
*Generic name: Doxepin hydrochloride*

## Why is this drug prescribed?

Return to top

Sinequan is used in the treatment of depression and anxiety. It helps relieve tension, improve sleep, elevate mood, increase energy, and generally ease the feelings of fear, guilt, apprehension, and worry most people experience. It is effective in treating people whose depression and/or anxiety is psychological, associated with alcoholism, or a result of another disease (cancer, for example) or psychotic depressive disorders (severe mental illness). It is in the family of drugs called tricyclic antidepressants.

## Most important fact about this drug

Return to top

Serious, sometimes fatal, reactions have occurred when Sinequan is used in combination with drugs known as MAO inhibitors, including the antidepressants Nardil and Parnate. Any drug of this type should be discontinued at least 2 weeks prior to starting treatment with Sinequan, and you should be carefully monitored by your doctor.

If you are taking any prescription or nonprescription drugs, consult your doctor before taking Sinequan.

## How should you take this medication?

Return to top

Take this medication exactly as prescribed. It may take several weeks for you to feel better.

*--If you miss a dose...*

If you are taking several doses a day, take the missed dose as soon as you remember, then take any remaining doses for that day at evenly spaced intervals. If it is almost time for your next dose, skip the one you missed and go back to your regular schedule. Never take 2 doses at the same time.

If you are taking a single dose at bedtime and do not remember until the next morning, skip the dose. Do not take a double dose to make up for a missed one.

*--Storage instructions...*

Store at room temperature.

## What side effects may occur?

Return to top

Side effects cannot be anticipated. If any develop or change in intensity, inform your doctor as soon as possible. Only your doctor can determine if it is safe for you to continue taking Sinequan.

The most common side effect is drowsiness.

- *Less common or rare side effects may include:*
  Blurred vision, breast development in males, bruises, buzzing or ringing in the ears, changes in sex drive, chills, confusion, constipation, diarrhea, difficulty urinating, disorientation, dizziness, dry mouth, enlarged breasts, fatigue, fluid retention, flushing, fragmented or incomplete movements, hair loss, hallucinations, headache, high fever, high or low blood sugar, inappropriate breast milk secretion, indigestion, inflammation of the mouth, itching and skin rash, lack of muscle control, loss of appetite, loss of coordination, low blood pressure, nausea, nervousness, numbness, poor bladder control, rapid heartbeat, red or brownish spots on the skin, seizures, sensitivity to light, severe muscle stiffness, sore throat, sweating, swelling of the testicles, taste disturbances, tingling sensation, tremors, vomiting, weakness, weight gain, yellow eyes and skin

## Why should this drug not be prescribed?

Return to top

If you are sensitive to or have ever had an allergic reaction to Sinequan or similar antidepressants, you should not take this medication. Make sure that your doctor is aware of any drug reactions that you have experienced.

Unless you are directed to do so by your doctor, do not take this medication if you have the eye condition known as glaucoma or difficulty urinating.

## Special warnings about this medication

Return to top

Sinequan may cause you to become drowsy or less alert; driving or operating dangerous machinery or participating in any hazardous activity that requires full mental alertness is not recommended.

Notify your doctor or dentist that you are taking Sinequan if you have a medical emergency, and before you have surgery or dental treatment.

## Possible food and drug interactions when taking this medication

Return to top

Alcohol increases the danger in a Sinequan overdose. Do not drink alcohol while taking this medication.

Never combine Sinequan with drugs known as MAO inhibitors. Medications in this category include the antidepressants Nardil and Parnate.

If you are switching from Prozac, wait at least 5 weeks after your last dose of Prozac before starting Sinequan.

If Sinequan is taken with certain other drugs, the effects of either could be increased, decreased, or altered. It is especially important to check with your doctor before combining Sinequan with the following:

Antidepressants that act on serotonin, such as Prozac, Zoloft, and Paxil
Other antidepressants such as Elavil and Serzone
Carbamazepine (Tegretol)
Cimetidine (Tagamet)

Clonidine (Catapres)
Flecainide (Tambocor)
Guanethidine (Ismelin)
Major tranquilizers such as Compazine, Mellaril, and Thorazine
Propafenone (Rythmol)
Quinidine (Quinidex)
Tolazamide (Tolinase)

## Special information if you are pregnant or breastfeeding

Return to top

The effects of Sinequan during pregnancy have not been adequately studied. If you are pregnant or planning to become pregnant, inform your doctor immediately. Sinequan may appear in breast milk and could affect a nursing infant. If this medication is essential to your health, your doctor may advise you to discontinue breastfeeding your baby until your treatment is finished.

## Recommended dosage

Return to top

### ADULTS

The starting dose for mild to moderate illness is usually 75 milligrams per day. This dose can be increased or decreased by your doctor according to individual need. The usual ideal dose ranges from 75 milligrams per day to 150 milligrams per day, although it can be as low as 25 to 50 milligrams per day. The total daily dose can be given once a day or divided into smaller doses. If you are taking this drug once a day, the recommended dose is 150 milligrams at bedtime.

The 150-milligram capsule strength is intended for long-term therapy only and is not recommended as a starting dose.

For more severe illness, gradually increased doses of up to 300 milligrams may be required as determined by your doctor.

### CHILDREN

Safety and effectiveness have not been established for use in children under 12 years of age.

### OLDER ADULTS

Due to a greater risk of drowsiness and confusion, older people are usually started on a low dose.

## Overdosage

Return to top

- *Symptoms of Sinequan overdose may include:*
  Agitation, coma, confusion, convulsions, dilated pupils, disturbed concentration, drowsiness, hallucinations, high or low body temperature, irregular heartbeat, overactive reflexes, rigid muscles, severely low blood pressure, stupor, vomiting

If you experience any of these symptoms, seek medical attention immediately. An overdose of this drug can be fatal.



RECEIVED
AUG 28 2007
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

### Doxepin Hydrochloride

- Trade name products which contain doxepine include: (Sinequan)(Adopin)(Triadapin)(Nova-Doxepin)

## INDICATION

A tricyclic antidepressant medication used for the treatment of depression. Occasionally used to treat itching.

## SIDE EFFECTS

Drowsiness, dizziness, tremors, anxiety, confusion, weakness, headache, increased heart rate, increased or decreased blood pressure, ringing in the ears, blurred vision, tongue swelling, constipation, nausea, vomiting, dry mouth, anorexia, poralyticileus, rash, urine retention, and sweating. Rare effects include: hallucinations, decreased sex drive, fainting, back pain, itching sore throat, involuntary movements of jaw, lips and tongue, nightmares, swollen breast, and swollen testicles.

## INTERACTIONS AND PRECAUTIONS

1. MAO inhibitors (Nardil) can lead to anxiety, elevated body temperatures, and seizures.
2. Methylphenidate may increase the antidepressant effects.
3. Cimetidine can increase the adverse effects of doxepin.
4. Barbiturates may decrease the effects of doxepin and lead to oversedation.
5. Use with anticoagulants (Coumadin) may increase anticoagulant effect.
6. Use with anticholinergics can increase anticholinergic effects.
7. Use with antihistamines can increase antihistamine effect.
8. Use with benzodiazepines can lead to oversedation.
9. Use with bupropin can increase risk of seizures.
10. Use with alcohol can increase intoxication - avoid.
11. Use with nicotine may decrease antidepressant effect.

## USUAL DOSE

Adults:
Antidepressant: 25mg three times a day.
Antipruritic: 10mg at bedtime.

Children (under 12): dosage not established

:Pixel Perfect Software
:P.O. Box Drawer 410129
:Melbourne, FL. 32941-0129
:Phone: (407) 777-5353
:Fax:    (407) 777-0323
:Sales:  (407) 779-0310

**A-7**

INTERNET: http://www.w2.com/pixel home page. htm

advertisement



**Back and Neck Pain Relief**
with Lifestyle-Friendly Surgery?

🔷 **Medtron**

DISCLAIMER    RxBOARD    ALTERNATIVES    TOP 200    ADVANCED SEARCH    ONLINE PHARM

### Vistaril®

**Generic Name: Hydroxyzine hye-DROX-i-zeen**

**Drug Class: Sedatives/Hypnotics**

Drug Search

advertisement



**Do you have Diabetes**

CLICK HERE

Get a FREE
glucose meter
from Access
Diabetic Supply

advertisement

## Contents

- Description

- General Information

- Proper Use

- Missed Dose

- Storage

- Side Effects

- Warnings/Precautions

- Overdose

- Drug Interactions

- Pregnancy/Nursing

- More Information

## Description

This medicine is a sedative which is used to help people with sleeping problems (such as trouble falling asleep, trouble staying asleep during the night, or waking too early in the morning). This medicine may be prescribed for other conditions as determined by your doctor.
*Top of page*

## General Information

This information is for educational purposes only. Not every known side effect, adverse effect, or drug

interaction is in this database. If you have questions about your medicines, talk to your healthcare provider.

ADD US TO
YOUR WEBSIT
PHARMCLIPS

*Top of page*

## Proper use of this medicine

Take this medicine exactly as directed. It may be taken with food or milk if stomach upset occurs.
*Top of page*

## Missed Dose

Take your next dose as soon as you remember. If it is time for your next dose, skip the missed dose and go back to your regular schedule. Do not double doses.
*Top of page*

## Storage

Keep this medication in the container it came in, tightly closed, and out of reach of children. Store it at room temperature and away from excess heat and moisture. Throw away any medication that is outdated or no longer needed.
*Top of page*

## Possible Side Effects

- o If any of these effects persist or worsen, inform your doctor promptly:
    - stomach upset
    - blurred vision
    - headache
    - dizziness
    - depression
    - impaired coordination
    - memory loss
    - hangover effect or clouded thinking may occur

*Top of page*

## Warnings/Precautions

- o This medicine may cause drowsiness.
- o Alcoholic beverages can increase the effects of this medicine and should be avoided.
- o Be cautious when driving or performing other hazardous activities. This medicine can impair judgment.

*Top of page*

## Overdose

Seek medical attention immediately. U.S. residents can call the national poison hotline at 1-800-222-1222. Canadian residents should call their local poison control center directly.
*Top of page*

## Drug Interactions

- o Possible drug interactions may occur with other sedating medications or pain medications.

o  Talk to your doctor if you are taking any medications for depression, pain, or seizures. <u>Other sedative medications including over-the-counter antihistimines can increase the side effects of this medicine and should be used cautiously.</u>

*Top of page*

## Pregnancy/Nursing

If you are pregnant or thinking of becoming pregnant, talk to your doctor about the benefits and the risks of taking this edicine during your pregnancy. This medicine is excreted in breast milk. Do not breastfeed while taking this medicine.

*Top of page*

## More Information

For more information about this medicine, talk to your healthcare provider.

*Top of page*

Copyright) 2004 PharmClips, Inc. All rights reserved. www.pharmclips.com

This information is not intended to cover all possible uses, directions, precautions, drug interactions, or adverse effects. This is general information and should not in any event be construed as specific instructions for individual patients. The publisher does not accept any responsibility for the accuracy of the information or the consequences arising from the application, use, or misuse of any of the information contained herein, including any injury and/or damage to any person or property as a matter of product liability, negligence, or otherwise. No warranty, expressed or implied, is made in regard to the contents of this material. The reader is advised to check with their health care provider before making any changes in their drug regimen.

Vistaril®

Field to search in:
Drug Names

⊙ and ○ or ○ as a phrase

☐ Case-Sensitive

☐ Whole Words Only    Search ⊗

This Page Last Revised February 24, 2005

**Return to Top** ⬆    **Search Medical Dictionary** ▶    **FAQ/Patient Monograph** ▶

RxList Home  •  Contact RxList  •  About RxList  •  Terms & Policies  •  Privacy Policy

## Hydroxyzine Hydrochloride

- Trade name products that contain hydroxyzine include: (Atarex) (Anxanil) (ApoHydroxyzine)(Atozine)(EVista)(Hydroxacen)(Hyzine)(Marax) (Mutipax)(Novohydroxyzin)(Quiess)(T.E.H.Tablets)(Theozine)(Vamate) (Vistaject)(Vistaquel)(Vistaril)(Vistazine)(Vistazine 50) (Vistaject-50)(Vistaject-25)

### INDICATION

An antihistamine medication with antiemetic properties, used for the symptomatic relief of anxiety and tension associated with psychoneurosis. This medication is also useful to control itching associated with various allergic conditions.

### SIDE EFFECTS

Dry mouth, drowsiness are the most commonly reported. Tremors, rash, headache, and seizures have been reported only rarely and with usually higher doses.

### INTERACTIONS AND PRECAUTIONS

1. Not considered safe for use in pregnancy or nursing mothers.
2. Alcohol and other sedatives, when used in combination, can potentiate the sedative effects of hydroxyzine.
3. Use with tricyclic antidepressants (Elavil, Sinequan, Desipramine) can result in increased effect of both drugs.
4. Use with carteolol can decrease the antihistamine effect.
5. Use with clozapine may result in a toxic effect on the central nervous system.
6. Use with fluoxetine may increase the depressant effects of both drugs.
7. Use with guanfacine may increase the depressant effects of both drugs.
8. Use with levcouorin may cause adverse reactions.
9. Use with narcotic pain medications can result in oversedation.

### USUAL DOSE

Adults:
For anxiety: oral, 50-100 mg as a single dose.
For allergies and nausea: 25-100 mg three to four times a day as needed.

Dr. Schueler's
Corner Drug Store

**A-9**

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE

VS.

STEVEN W KRAFCHICK

Alias: NO ALIASES

DOB: 01/06/1965
SBI: 00178856

CASE NUMBER:
0101010946

CRIMINAL ACTION NUMBER:
PN01-01-2351
MURDER 2ND(F)
LIO:MURDER 1ST
IN01-01-2352
PDWDCF(F)

## SENTENCE ORDER

NOW THIS 13TH DAY OF FEBRUARY, 2002, IT IS THE ORDER OF
THE COURT THAT:

The defendant is adjudged guilty of the offense(s) charged.
Costs are hereby suspended. Defendant is to pay all
statutory surcharges.

AS TO PN01-01-2351 : TIS
MURDER 2ND

Effective January 16, 2002  the defendant is sentenced
as follows:

The defendant is placed in the custody of the Department
of Correction for 20 year(s) at supervision level 5

- Suspended after serving 20 year(s)  at supervision level
5

- Suspended for 6 month(s)  at supervision  level 2

AS TO IN01-01-2352 : TIS
PDWDCF

The defendant is placed in the custody of the Department
of Correction for 20 year(s) at supervision level 5
**APPROVED ORDER**    1      July 30, 2002 09:07

Exhibit - A-

STATE OF DELAWARE
          VS.
STEVEN W KRAFCHICK
DOB: 01/06/1965
SBI: 00178856

Probation is consecutive to criminal action number
010102351

## SPECIAL CONDITIONS BY ORDER

STATE OF DELAWARE
    VS.
STEVEN W KRAFCHICK
DOB: 01/06/1965
SBI: 00178856

**CASE NUMBER:**
**0101010946**

Pay financial obligations during the probationary period.

Be evaluated for substance abuse and follow any
recommendations for counseling, testing or treatment deemed
appropriate.

Be assigned to the residential drug/alcohol program until
such program is completed.

Be assigned to the outpatient drug/alchol program until
program is completed.

Have no drugs/alcohol during period of sentence unless
medically prescribed.

Submit to random urinalysis or such other drug testing as
deemed appropriate.

**NOTES**

6 months at supervision level 2, is pursuant 11 Del.C.
~4204(L).

Defendant is to undergo a mental health evaluation and
follow any recommendations for counseling and treatment as
deemed appropriate by the Dept. of Corrections.

_____

**JUDGE CHARLES H TOLIVER IV**

## FINANCIAL SUMMARY

STATE OF DELAWARE
        VS.
STEVEN W KRAFCHICK
DOB: 01/06/1965
SBI: 00178856

                            CASE NUMBER:
                            0101010946


SENTENCE CONTINUED:


TOTAL DRUG DIVERSION FEE ORDERED

TOTAL CIVIL PENALTY ORDERED

TOTAL DRUG REHAB. TREAT. ED. ORDERED

TOTAL EXTRADITION ORDERED

TOTAL FINE AMOUNT ORDERED

FORENSIC FINE ORDERED

RESTITUTION ORDERED                               .00

SHERIFF, NCCO ORDERED

SHERIFF, KENT ORDERED

SHERIFF, SUSSEX ORDERED

PUBLIC DEF, FEE ORDERED

PROSECUTION FEE ORDERED

VICTIM'S COM ORDERED

VIDEOPHONE FEE ORDERED                           2.00

_____

TOTAL                                            2.00


**APPROVED ORDER**      4      July 30, 2002 09:07

Superior Court of the State of Delaware, ___*NC*___ County

# PLEA AGREEMENT

ate of Delaware v. ___Steven Knafchick___

se No(s): __01010109946__ Cr.A.#s: __1N01-01-2351; 2352; 2517; 2540__
__2519; 2520; 2521; 2522; 2523__

Title 11HAB. OFFENDER _____   ☐ BOOT CAMP ELIGIBLE   ☐ INELIGIBLE
RULE 11(e)(1)(C) — If out of guideline, reason is as follows: _____
Title 11, §4336, sex offender notification required   ☐ Title 11, §9019(e), forensic fine ☐ $100(F), ☐ $50(M)

Defendant will plead guilty to:

| Count | Cr.A.# | Charge | [LIO if applicable] |
|---|---|---|---|
| I | 1N01-01-2351 | Murder 2d | [LIO 11 §635 |
| II | 1N01-01-2352 | PDWDCF | |

Upon the sentencing of the defendant, a **nolle prosequi** is entered on ☐ the following charges/☒ all remaining charges on this indictment:

| Count | Cr.A.# | Charge |
|---|---|---|

Sentence Recommendation/Agreement: ☒ PSI   ☒ Immediate Sentencing

State and Defendant agree to the following:
☐ Restitution: _____
☐ No _____ contact w/ _____
☐ Other Conditions: _____

DAG: __MARSHA EPSTEIN__          DEF. COUNSEL: __EC Biakaski__
_____PRINT NAME_____          _____PRINT NAME_____
__Marsha Epstein__               __EC Buray__
_____SIGNATURE_____           _____SIGNATURE_____

Date: __2/13/02__               DEFENDANT: __Stu W. _____

A-18

XC: Attorney for Defendant; Defendant
    Attorney General, Attorney General Worksheet        Page ___ of ___

# TRUTH IN SENTENCING GUILTY PLEA FORM
## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
### IN AND FOR ___ New Castle ___ COUNTY

STATE OF DELAWARE )
V. ) DEF. ID. NO _0 10 1010946_
) CR.A. NO. _____
Steven Krafchick ,                )

*efendant must answer the following questions in his or her own handwriting.*

Birth ___ 1/6/65 ___ Last grade in school completed ___ 8th ___

| | |
|---|---|
| you ever been a patient in a mental hospital? | ☐ Yes ☒ No |
| ou under the influence of alcohol or drugs at this time? | ☐ Yes ☒ No |
| you freely and voluntarily decided to plead guilty to the charges listed in your written plea agreement? | ☒ Yes ☐ No |
| you been promised anything that is not stated in your written plea agreement? | ☐ Yes ☒ No |
| our attorney, the State or anyone threatened or forced you to enter this plea? | ☐ Yes ☒ No |

nderstand that because you are pleading guilty you will not have a trial and you therefore waive (give up) your constitutional righ

(1)  to be presumed innocent until the State can prove each and every part of the charge(s) against you beyond a reasonable doubt;
(2)  to a speedy and public trial;
(3)  to trial by jury;
(4)  to hear and question the witnesses against you;
(5)  to present evidence in your defense:
(6)  to testify or not testify yourself; and,
(7)  to appeal to a higher court?                    ☐ Yes ☐ No

| OFFENSE | STATUTORY PENALTY | TIS GUIDELINE |
|---|---|---|
| Murder 2no | 16 - 20 | 10 Yrs Min - Man |
| Pruper | 2 - 20 | 2 - 5 yrs |
| | | |

AL CONSECUTIVE MAXIMUM PENALTY: ___ 40 yrs ___

are not a citizen of the United States, you are hereby advised that conviction of the offense for which you have been charged
ave the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the
f the United States.

u understand that, if incarcerated, you will not be eligible for parole and the amount of early release credits which you may
ill be limited to a maximum of ninety (90) days per year?                    ☒ Yes ☐ No

e a mandatory minimum penalty?    ☒ Yes ☐ No;   If so, what is it? ___ 10 yrs, ___ 2 yrs Pruper

yone promised you what your sentence will be?                    ☐ Yes ☒ No

u on probation or parole? (A guilty plea may constitute a violation.)                    ☐ Yes ☒ No
u understand that a guilty plea to a felony will cause you to lose your right to vote, to
a juror, to hold public office, to own or possess a deadly weapon and other civil rights?    ☒ Yes ☐ No
u satisfied with your lawyer's representation of you and that your lawyer has
ly advised you of your rights and of your guilty plea?                    ☒ Yes ☐ No

_(signature)_ ___ 2/13/02 ___ _(signature)_

Defense Counsel
e: ___ EC BALKUSKI ___ Date . 

**A-19**

Print name: ___ Steven B Krafchick ___
Defendant

or Court, Attorney General, Attorney for Defendant, Defendant

# IMMEDIATE SENTENCING FORM*

State v. _Stwen Kraschick_ _____ Cr.A.# _____ Def.ID (Case#) _010100946_

## TO BE COMPLETED BY THE DEPUTY ATTORNEY GENERAL

Records of the Attorney General's Office in New Castle County indicate the following convictions since 1976:

__0__    Number of prior felonies (Specify crime and year of conviction)

_____

_____

__0__    Number of prior non-violent felonies (Specify crime and year of conviction)

_____

_____

__9__    Number of prior misdemeanors (Specify crime and year of conviction)
(1 juv.)    O.t. ('92) ('00)                 ; disorderly conduct ('97)
           poss. alcohol by minor ('82)( juv.) ; criminal contempt ('97)
           Assault 3rd ('95) ('96)
           VOP ('97)('01)
           Terrorishc Thrdternus ('97)

**YES/UNKNOWN**  Was this crime committed while defendant was on
(Circle one)     release or pending trial/sentencing?

**YES/NO**       Will this plea result in an enhanced penalty and/or a minimum
(Circle one)     mandatory penalty?

**YES/NO**       Is a First Offender Program being requested?
(Circle one)     _____ DUI      _____ Drug      _____ Bad Check

_M.T. Knoll_        _____signature_____        _2|13|02_
(print)              (sign)                     Date
Deputy Attorney General

*This form is required for immediate sentencing.        A-48 20

## Exceptional Sentences

✱        The standard sentence range is presumed to be appropriate for the typical criminal case. The court may impose a sentence outside the standard sentence range for that offense if it finds that there are **substantial and compelling** reasons justifying an exceptional sentence.

The following aggravating and mitigating circumstances for exceptional sentences are provided as examples and are not intended to be exclusive reasons for departure. An aggravating or mitigating circumstance, whether listed below or not, shall only apply if it does not reflect the statutory language defining the current offense, or constitute an element thereof.

✱        When an exceptional sentence is decreed, the governing factor(s) leading to the exceptional sentence must be stated for the record, and should be identified in the sentencing order or on the sentencing worksheet.

## AGGRAVATING FACTORS  For Exceptional Sentences

**Violent Felonies Only:**
   **EXCESSIVE CRUELTY**
   a. Those facts surrounding the commission of a violent felony which demonstrate such a callousness and cruelty towards the victim as to shock the conscience of the Court. [Standard 4 II.A.(i)]
   b. Allowable Penalty : Up to the statutory maximum for the instant offense.
   **PRIOR VIOLENT CRIMINAL CONDUCT**
   a. Defendant has demonstrated, by his prior criminal history, a propensity for violent criminal conduct. (SEE POLICY NO. 4) [Standard 4 I.A.(i)]
   b. Recommended Penalties :
       1. With two or more prior, separate violent felonies --Up to the statutory maximum.
       2. With one prior violent felony -- up to 50% of the statutory maximum.
**Any Offense**
   **Repetitive Criminal Conduct**
   Definition : Repetitive Criminal Conduct is conviction or adjudication for the same or    similar offense on two or more previous, separate occasions. (SEE POLICY NO.
   **Need For Correctional Treatment**
   The defendant is in need of correctional treatment which can be most effectively provided if he is placed in total confinement. [Standard 4 I.B]
   **Undue Depreciation Of Offense**
   It would unduly depreciate the seriousness of the offense to impose a sentence of other than total confinement. [Standard 4 I.D.]
   **Major Economic Offense Or Series Of Offenses:**
   Identified by a consideration of any of the following factors:
   a. The offense involved multiple victims or multiple incidents per victim;
   b. The offense involved attempted or actual monetary loss substantially greater than typical for the offense;
   c. The offense involved a high degree of sophistication or planning, or occurred over a lengthy period of time;
   d. The defendant used his/her position of trust, confidence or fiduciary responsibility to facilitate the offense.

**A-21**

Westlaw.

C
DELAWARE CODE ANNOTATED
TITLE 11. CRIMES AND CRIMINAL PROCEDURE
PART IV. PRISONS AND PRISONERS
CHAPTER 65. DEPARTMENT OF CORRECTION
SUBCHAPTER X. SENTENCING ACCOUNTABILITY COMMISSION
        § 6581  Sentencing guidelines.

(a) A computer-driven model of proposed sentencing criteria shall be created by March 1, 1985, which will be able to project the effect of alternative policy decisions on the Department of Correction resources. Sentencing guidelines will be drafted with nonbinding pilot testing by July 1, 1985.

The Commission shall submit to the Supreme Court on or before March 1, 1986, sentencing guidelines developed in accordance with § 6580(c) of this title for adoption by Court rule. Such guidelines shall have no force or effect unless so adopted, and shall not in any event authorize or be construed as authorizing the exercise of any power or duty exceeding or conflicting with those heretofore or hereafter granted by act of the General Assembly or pursuant to inherent authority granted under the Delaware Constitution.

(b) The Commission, on or before July 1, 1987, shall recommend to the Governor and the General Assembly legislation necessary for the implementation of the sentencing guidelines.

(c) Consistent with the goals of this subchapter, the sentencing guidelines recommended by the Commission shall:

   (1) Formulate a series of sanctions ranging from nonincarcerative to incarcerative. These sanctions may include, but not be limited to, fines, costs, restitution, unsupervised and/or supervised probation, community service, work release and community-based residential and nonresidential programs, work camps and electronic monitoring. These sanctions shall be placed in one or more accountability levels;

   (2) Establish detailed objective criteria to be utilized in determining which offenders shall be assigned to each of the various accountability levels, such criteria to combine **factors** relating to the nature of the offense, the background and criminal history of the offender and the availability of resources;

   (3) Define under what conditions of **aggravation or mitigation** and in what manner a sentencing judge may impose a sentence outside of the sentencing guidelines and recommend such **mitigating and/or aggravating** circumstances; and

   (4) Define under what circumstances, by what process, and by whom offenders may be moved from 1 accountability level to another, subject to any law regulating such movement.

(d) The Commission shall estimate to what extent public and private resources are appropriate and available to meet the specifications and supervision standards necessitated by the population of offenders to be assigned to each level.

(e) The Commission shall define the roles of the various criminal justice agencies in the implementation of the proposed guidelines.

**A-17**

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

DE ST TI 11 § 6581                                                    Page 2
11 Del.C. § 6581


(f) The Commission shall recommend, as appropriate, mechanisms to insure that offenders
are assessed a reasonable fee for their supervision and/or treatment.

(g) The Commission shall also recommend a procedure or a tribunal for appellate review by
either the defendant or the State when sentences are imposed outside of the guidelines.

(h) The Commission shall have the authority to collect from any state or local
governmental entity information, data, reports, statistics or such other material which is
necessary to carry out the Commission's functions.

(i) The executive department shall provide staff services for the Commission which shall,
for administrative purposes, be placed within that office.

(j) The Commission shall carry out such other duties consistent with its mandate as the
General Assembly or the executive department shall from time to time direct.

(64 Del. Laws, c. 402, § 1; 65 Del. Laws, c. 206, § 1.)

                <General Materials (GM) - References, Annotations, or Tables>


NOTES, REFERENCES, AND ANNOTATIONS

**Failure of Sentencing Accountability Commission to recommend process for appellate review.**
-- The General Assembly, rather than the Supreme Court, is the appropriate forum to seek
redress from the Sentencing Accountability Commission's apparent failure to carry out its
legislative mandate to recommend a process for appellate review of deviations from its
guidelines. Siple v. State, Del. Supr., 701 A.2d 79 (1997).

11 Del.C. § 6581, DE ST TI 11 § 6581


Current through 2003 Regular Session of the 142nd General Assembly


        Copyright © 1975-2003 by The State of Delaware. All rights reserved.

END OF DOCUMENT








Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEVEN W. KRAFCHICK, | § | |
| | § | |
| Defendant Below- | § | No. 555, 2006 |
| Appellant, | § | |
| | § | |
| v. | § | Court Below—Superior Court |
| | § | of the State of Delaware, |
| STATE OF DELAWARE, | § | in and for New Castle County |
| | § | Cr. ID 0101010946 |
| Plaintiff Below- | § | |
| Appellee. | § | |

Submitted:   March 7, 2007
Decided:   April 26, 2007

Before **HOLLAND**, **BERGER**, and **JACOBS**, Justices.

### O R D E R

This   26 th  day of April 2007, after careful consideration of appellant's

opening brief and the State's motion to affirm, we find it manifest that the

judgment of the Superior Court should be affirmed. Although the Superior Court

wrongly concluded that appellant's second postconviction motion was untimely,

the Superior Court did not err in its alternative conclusions that appellant's claims

also were procedurally barred as being repetitive and formerly adjudicated, and

appellant had failed to overcome these procedural hurdles.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior

Court is AFFIRMED.

BY THE COURT:

_Carolyn Berger_
Justice

IN THE SUPREME COURT OF THE STATE OF DELAWARE

555 , 2006

PRO SE
(DCC/#178856)

STEVEN W. KRAFCHICK,
    Defendant Below,
    Appellant,
      v.

L. C. MEYERS

STATE OF DELAWARE,
    Plaintiff Below,
    Appellee.

DF $ 00.00

2006

| | | | |
|---|---|---|---|
| 1 | Oct | 12 | Notice of appeal from the Order dated 9/20/06 in the Superior Court in and for New Castle County, by Judge Toliver, in Cr. PN01-01-2351R2 and IN01-01-2352R2 with no designation of transcript. (served by mail 10/9/06) (kms) |
| 2 | Oct | 12 | Brief schedule issued. (opening brief due 11/27/06) (kms) |
| 3 | Oct | 12 | Letter dated 10/12/06 from Senior Court Clerk to Prothonotary, record is due to be filed by 11/6/06. (kms) |
| 4 | Oct | 23 | Record as ordered. (kms) |
| 5 | Nov | 13 | Motion to proceed in forma pauperis by appellant. (served by mail 11/6/06) (kms) |
| 6 | Nov | 13 | Order dated 11/13/06 by Clerk, motion for leave to proceed in forma pauperis is GRANTED. (kms) |
| 7 | Nov | 21 | Motion under Rule 15(b) by appellant. (served by mail on mail on 11/20/06) (kms) |
| 8 | Nov | 27 | Order dated 11/27/06 by Jacobs, J., appellant's opening brief and appendix are due 02/27/07. There will be no further extensions. (mjd) |

2007

| | | | |
|---|---|---|---|
| 9 | Feb | 26 | Appellant's opening brief and appendix. (served by hand or mail 2/23/07) (lsb) |
| 10 | Mar | 07 | State's motion to affirm. (served by mail on 3/7/07) (475) (brf) |
| 11 | Mar | 19 | Motion under Rule 15(b) by appellant. (served by mail 3/15/07) (lsb) |
| 12 | Mar | 20 | Letter dated 3/20/07 from Senior Court Clerk to appellant, advising him that he can not respond to the motion to affirm. (lsb) |

13    Apr   26          Order dated 4/26/07 by Berger,J.,AFFIRMED.(RJH,CB,JBJ)
                        (brf)

14    May   03          Motion for reargument by appellant.
                        (served by mail on 4/30/07) (lsb)

15    May   03          Letter dated 4/30/07 from appellant to Clerk,
                        requesting copy of docket sheet. (copy sent) (lsb)

SUPERIOR COURT
OF THE
STATE OF DELAWARE

CHARLES H. TOLIVER, IV
*JUDGE*

NEW CASTLE COUNTY COURTHOUSE
500 NORTH KING STREET, SUITE 10400
WILMINGTON, DELAWARE 19801-3733
TELEPHONE (302) 255-0657

September 20, 2006

Mr. Steven W. Krafchick
SBI# 00178856
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

> **Re:** ***State v. Steven W. Krafchick***
> **(I.D. No.: 0101010946)**
> **Cr. A. No.: PN01-01-2351R2 and  IN01-01-2352R2**

Dear Mr. Krafchick:

You filed the instant Rule 61 Motion for Postconviction Relief, on March 22, 2006. Like your first such motion filed March 8, 2005, this motion was based on the forty year prison sentence you received for Murder Second Degree and Possession of a Deadly Weapon During the Commission of a Felony. That which follows is the Court's response to the issues so presented.

First, you contend that the Court, after receiving information that you were under the influence of medications, i.e., Sinequan and Vistaril, abused its discretion by failing to conduct a competency hearing before accepting your guilty plea. Second, you maintain that the Court violated your Fourteenth Amendment and Sixth Amendment rights when it considered during sentencing that the offenses committed were linked to domestic violence.

B10

Page Two
**Re:    *State v. Steven W. Krafchick***
**(I.D. No.: 0101010946)**
**Cr. A. No.: PN01-01-2351R2 and IN01-01-2352R2**

In response, the State opposes your motion along three procedural lines.    First, it is asserted that your motion is barred by Rule 61(i)(1) since it was filed more than one year after your judgment of conviction was final.  Second, it is argued that repetitive motions are generally barred since any grounds for relief not asserted in a prior proceeding are barred by Rule (61)(i)(2).  Third, the State argues that Rule 61(i)(4) bars your motion since the Court may not reexamine issues that have been previously adjudicated.  And the State further contends that you have failed to show prejudice which in the interest of justice should lift the procedural bars or present a colorable constitutional claim warranting consideration because of a miscarriage of justice affecting the proceedings leading to your conviction.

As the Court has held on numerous occasions, a predicate to addressing the merits of your contentions is an examination to determine whether any procedural bars exist.  The procedural bars set forth in Rule 61(i)(1)-(4) may only be lifted if there is a mechanism to do so in the pertinent subsection of Rule 61.[1]  If there is no relief there, the "catchall" provision of Rule 61(i)(5) can provide relief from procedural bars contained in Rule

---

[1]  A motion for postconviction relief filed after July 1, 2005, may be filed no more than one year after the judgment of conviction is final or, if it asserts a retroactively applicable right that is newly recognized after the judgment is final, no more than three years after the right is first recognized by the Supreme Court of Delaware or by the United State Supreme Court. Super. Ct. Crim. R. 61(i)(1).  Grounds not presented in prior postconviction proceedings or formerly adjudicated claims are barred unless consideration of the claim is warranted in the interest of justice. Super. Ct. Crim. R. 61(i)(2) & (4). Likewise, any ground for relief not asserted in the proceedings leading to the judgement of conviction are barred unless the movant shows cause for relief and prejudice. Super. Ct. Crim. R. 61(i)(3).

B11

Page Three
**Re:  State v. Steven W. Krafchick**
**(I.D. No.: 0101010946)**
**Cr. A. No.: PN01-01-2351R2 and IN01-01-2352R2**

61(i)(1)-(3).

To be specific, Rule 61(i)(5) provides that the aforementioned bars may be raised where the defendant establishes a colorable claim that there has been a "miscarriage of justice" under Rule 61(i)(5). A colorable claim of "miscarriage of justice" occurs when there is a constitutional violation that undermines the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction.[2] This exception to the procedural bars is very narrow and is only applicable in very limited circumstances.[3] The defendant bears the burden of proving that he has been deprived of a "substantial constitutional right."[4]

Unfortunately for you, the merits of your claims will not be reached by the Court. In the first instance, you abandoned any rights you may have had in those regards when you knowingly and voluntarily plead guilty to the charges then pending against you. A legion of Delaware cases instruct that by pleading guilty, all alleged pretrial defects are cured and any such claims are waived by the entry of a guilty plea.[5] Here, on February 13, 2002, after your trial started, the Court accepted your plea after a lengthy colloquy

---

[2] Super. Ct. Crim. R. 61(i)(5).

[3] *Younger v. State*, 580 A.2d 552, 555 (Del. 1990).

[4] *Id.*

[5] *State v. Waters*, 2000 WL 305346 (Del. Super.); *Kennedy v. State*, 667 A.2d 1319 (Del. 1995); *State v. Moreno*, 2001 WL 112065 (Del. Super.); *State v. Foster*, 2001 WL 1628310 (Del. Super.), aff'd 791 A.2d 750 (Del. 2002); *State v. Ayers*, 802 A.2d 278 (Del. Super. Ct. 2002).

B12

Page Four
**Re:** *State v. Steven W. Krafchick*
    **(I.D. No.: 0101010946)**
    <u>Cr. A. No.: PN01-01-2351R2 and IN01-01-2352R2</u>

between you and the Court. The Court was made aware of the issues surrounding your

mental health and reviewed the reports of at least two mental health professionals who

evaluated you. You were given an opportunity to discuss the plea with your defense

counsel and then you accepted the plea without hesitation. You also completed the Truth-

in-Sentencing Guilty Plea Form and the Plea Agreement Form, which acknowledge that you

understood the proceedings and knowingly and voluntarily waived any trial and/or

constitutional rights that might have applied.

    Your motion is further barred for at least three others reasons.

    First, a motion for postconviction relief filed after July 1,2005, may be filed no more

than one year after the judgment of conviction is final or, if it asserts a retroactively

applicable right that is newly recognized after the judgment is final, no more than three

years after the right is first recognized by the Supreme Court of Delaware or by the United

State Supreme Court.[6]  Your plea was formerly entered on February 13, 2002. You

subsequently filed this motion on March 22, 2006. That filing occurred over three years

after your conviction thus, your motion is procedurally barred by Rule 61(i)(1).

    Second, you filed a previous Rule 61 postconviction motion since your conviction

four years ago. That motion was denied by this Court on March 8, 2005, and the decision

was affirmed by the Supreme Court on February 3, 2006. Under Rule 61(i)(4), "any

---

    [6] Super. Ct. Crim. R. 61(i)(1).

B13

Page Five
**Re:**   ***State v. Steven W. Krafchick***
     **(I.D. No.: 0101010946)**
     **Cr. A. No.: PN01-01-2351R2 and  IN01-01-2352R2**

ground for relief that was formerly adjudicated, whether in the proceeding leading to the

judgment of conviction, in an appeal, [or] in a postconviction proceeding . . . , is thereafter

barred, unless reconsideration of the claim is warranted in the interests of justice."[7]  Since

the instant  postconviction motion appears to raise issues that were previously denied on

March 8, 2005, you are therefore barred from reasserting these claims.  Nor have you

provided any basis upon which this Court could conclude that it is in the interests of justice

to revisit the issues you have raised.

Third, grounds not presented in proceedings below leading to the judgment of

conviction or prior postconviction proceedings are barred unless consideration of the claim

is warranted in the interest of justice.[8]  As a result, the Court is prohibited by Rule 61(i)(2)

from considering issues so proffered in your motion which are now being presented for the

first time.

Having examined the record in light of your complaints, it is apparent that none of

the circumstances leading up to and culminating in the entry of your plea suggest that

there is sufficient cause or prejudice to warrant such relief, therefore, the exception

contained in Rule 61(i)(3) is not applicable.  Nor do I find that the Court's failure to conduct

a competency hearing, or the fact that the Court considered during your sentencing that

---

[7] Super. Ct. Crim. R. 61(i)(4).

[8] Super. Ct. Crim. R. 61(i)(2) & (4).

B14

Page Six
**Re:** *State v. Steven W. Krafchick*
**(I.D. No.: 0101010946)**
**Cr. A. No.: PN01-01-2351R2 and IN01-01-2352R2**

your conduct constituted domestic violence, establishes a "colorable claim" sufficient to

show a "miscarriage of justice" as Rule 61(i)(5) demands. In fact, the Supreme Court

affirmed your conviction and sentence on May 29, 2003, after this Court stated its reasons

for your sentence with particularity. "The interests of justice" do not, as a result, require

further review of the claims you have asserted.

For all the reasons set forth above, the Court must conclude that your motion must

be, and hereby is, **denied.**

**IT IS SO ORDERED.**

Sincerely yours,

Charles H. Toliver, IV
Judge

CHT,IV/lat
oc:    Prothonotary
cc:    Maria T. Knoll, Esquire
       Investigative Services

B 15

IN THE SUPREME COURT OF THE STATE OF DELAWARE

124 , 2005

PRO SE                          STEVEN W. KRAFCHICK,
(DCC - #00178856)                 Defendant Below,
                                  Appellant,
                                v.

T. J. DONOVAN                   STATE OF DELAWARE,
                                  Plaintiff Below,
                                  Appellee.

DF $ 00.00

2005

| 1 | Apr | 01 | Notice of appeal from the order dated 3/8/05, in the Superior Court in and for New Castle County, by Judge Toliver, in Cr.ID No. 0101010946. (served by mail 3/31/05) (eas) |
|---|-----|----|---|
| 2 | Apr | 01 | Statement Pursuant to Rule 9 (e) in Lieu of Ordering Transcript of Proceedings Below. (served by mail 3/31/05) (eas) |
| 3 | Apr | 01 | Motion to proceed in forma pauperis by appellant. (served by mail 3/31/05) (eas) |
| 4 | Apr | 01 | Order dated 4/1/05 by Clerk, appellant's motion to proceed in forma pauperis is GRANTED, limited only to waiver of docketing fee. (eas) |
| 5 | Apr | 01 | Brief schedule issued. (opening brief due 5/16/05) (eas) |
| 6 | Apr | 01 | Letter dated 4/1/05 from Senior Court Clerk to Prothonotary, record is due to be filed by 4/25/05. (eas) |
| 7 | Apr | 21 | Record as ordered. (eas) |
| 8 | Apr | 28 | Motion under Rule 15(b) by appellant.  (served by mail 4/25/05) (eas) |
| 9 | May | 02 | Order dated 5-2-05 by Ridgely, J., appellant's opening brief and appendix are due 6-15-05. (clh) |
| 10 | Jun | 02 | Motion under Rule 15(b) by appellant. (served by mail 5/31/05) (eas) |
| 11 | Jun | 06 | Order dated 6//6/05 by Holland, J., appellant's opening brief and appendix are due 7/15/05. (eas) |
| 12 | | | Motion for Extension of Time to File by appellant. (served by mail 6/29/05) (eas) |

Order dated 7/5/05 by Berger, J., appellant's opening

|    |      |    | brief and appendix are due 8/1/05. No further extensions will be granted. (filed on 7/5/05) (rdd). |
|----|------|----|----|
| 14 | Jul  | 25 | Appellant's opening brief and appendix. (served by mail 7/22/05)(clh) |
| 15 | Jul  | 29 | Letter dated 7/27/05 from appellant to Clerk, enclosing appellant's brief corrections (served by mail 7/27/05) (eas) |
| 16 | Aug  | 16 | Letter dated 8/12/05 from appellant to Clerk, requesting a docket sheet. (sent) (eas) |
| 17 | Aug  | 24 | Appellee's answering brief. (served by mail 08/24/05) (mjd) |
| 18 | Aug  | 30 | Motion for an Extension of Time Under Rule 15(b) by appellant. (served by mail 8/26/05) (eas) |
| 19 | Sep  | 01 | Order dated 09/01/05 by Jacobs, J., appellant's reply brief and appendix are due 10/09/05. (mjd) |
| 20 | Sep  | 22 | Appellant's reply brief and appendix. (served by mail 9/20/05) (eas) |
| 21 | Oct  | 28 | Notice dated 10-28-05 from Clerk to parties, the case will be submitted for decision on briefs as of 11-4-05. (clh) |
| 22 | Nov  | 03 | Letter dated 11/1/05 from appellant to Clerk, requesting a docket sheet and advising that his last letter requesting a docket sheet had the wrong case number on it. (docket sheet sent) (eas) |

2006

| 23 | Jan | 17 | Order dated 01/17/06 by Berger, J., AFFIRMED (MTS,CB, JBJ) (mfm) |
|----|-----|----|----|
| 24 | Jan | 26 | Motion for Reargument with Exhibits. (served by mail 1/24/06) (eas) |
| 25 | Jan | 31 | Order dated 1/31/06 by Steele, C.J., appellant's Motion for Reargument is DENIED. (MTS,CB,JBJ) (eas) |
| 26 | Feb | 02 | Record and mandate to clerk of court below. Case Closed (afb). |
| 27 | Feb | 09 | Prothonotary's receipt of record and mandate on 2-3-06. (clh) |

2007

| 28 | May | 03 | Letter dated 4/30/07 from appellant to Clerk, requesting copy of docket sheet. (copy sent) (lsb) |
|----|-----|----|----|

Westlaw.

892 A.2d 1084

892 A.2d 1084, 2006 WL 141044 (Del.Supr.)
(Cite as: 892 A.2d 1084)

ECEIVED
AUG 2 8 2007
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Page 1

Briefs and Other Related Documents
Krafchick v. StateDel.Supr.,2006.(The decision of
the Court is referenced in the Atlantic Reporter in a
'Table of Decisions Without Published Opinions.')
Supreme Court of Delaware.
Steven W. KRAFCHICK, Defendant
Below-Appellant,
v.
STATE of Delaware, Plaintiff Below-Appellee.
No. 124,2005.

Submitted Nov. 4, 2005.
Decided Jan. 17, 2006.
Reargument Denied Jan. 31, 2006.

Court Below-Superior Court of the State of
Delaware in and for New Castle County, Cr. ID No.
0101010946.

Before STEELE, Chief Justice, BERGER and
JACOBS, Justices.

*ORDER*

*1 This 17th day of January 2006, upon
consideration of the briefs of the parties and the
record below, it appears to the Court that the
judgment of the Superior Court with respect to the
appellant's ineffective assistance of counsel claims
should be affirmed on the basis of and for the
reasons set forth in its decision dated March 8,
2005. The appellant's additional claims of error and
abuse of discretion on the part of the trial court
were not presented to the Superior Court in the first
instance and, therefore, will not be considered in
this appeal.[FN1]

FN1. Supr. Ct. R. 8.

*1 NOW, THEREFORE, IT IS ORDERED that the
judgment of the Superior Court is AFFIRMED.

Del.Supr.,2006.
Krafchick v. State
892 A.2d 1084, 2006 WL 141044 (Del.Supr.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3074859 (Appellate Brief) Appellant's
Reply Brief (Sep. 20, 2005) Original Image of this
Document (PDF)
• 2005 WL 2312613 (Appellate Brief) State's
Answering Brief (Aug. 24, 2005) Original Image of
this Document with Appendix (PDF)
• 2005 WL 2397174 (Appellate Brief) Appellant's
Opening Brief (Jul. 22, 2005) Original Image of this
Document with Appendix (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EX. C

Westlaw.

Not Reported in A.2d                                                                Page 1

Not Reported in A.2d, 2005 WL 697940 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

State    v.    KrafchickDel.Super.,2005.Only    the
Westlaw citation is currently available.
UNPUBLISHED  OPINION.  CHECK  COURT
RULES BEFORE CITING.
Superior Court of Delaware.
STATE of Delaware,
v.
Steven W. KRAFCHICK, Defendant.
Submitted Nov. 15, 2004.
Decided March 8, 2005.

On the Defendant's Motion for Post-conviction
Relief.

Steven W. Krafchick, Smyrna, Delaware, for
Defendant.

*OPINION AND ORDER*

TOLIVER, J.
*1 Presently before the Court is the motion filed by
the Defendant, Steven W. Krafchick, seeking
post-conviction relief pursuant to Superior Court
Criminal Rule 61.

*FACTS AND PROCEDURAL POSTURE*

*1 On February 26, 2001, the Defendant was
indicted by the grand jury and charged with Murder
First Degree and related offenses arising out of the
death of his wife, Dawn Krafchick. There was no
dispute about the fact that both were employed at
the Manor Park Restaurant in New Castle,
Delaware, where Ms. Krafchick was stabbed to
death by the Defendant on January 15, 2001. Trial
began with jury selection on February 5, 2002 and
continued until February 13, 2002, when the
Defendant elected to enter a plea to Murder Second
Degree and Possession of a Deadly Weapon During
the Commission of a Felony.

*1 Following the entry of his pleas, the Defendant

asked  the  Court  to  order  a  pre-sentence
investigation prior to imposing the sentence. The
Court declined to do so, and over the objection of
the defense, the Court proceeded to impose
sentence. Specifically the Defendant was sentenced
to a total of forty years in prison followed by six
months of probation. Thirty of the forty years were
to be served as a period of mandatory incarceration.
[FN1] The Defendant's motion to reduce or otherwise
modify the sentence imposed was denied by this
Court on May 24, 2002.

> FN1.  The  Sentencing  Accountability
> Commission  ("SENTAC")  guidelines
> recommended ten years for the conviction
> of Murder Second Degree and two to five
> years on the PDWDCF conviction. *See*
> Del. Sent'g Accountability Comm.2002
> Benchbook 19-20. The recommendations
> were not binding on the Court. The
> minimum sentences to be served by statute
> were and are ten and two years
> respectively on those offenses. *See* 11 *Del.
> C.* §§ 635 & 4205(b)(2).

*1 The Defendant then lodged an appeal with the
Delaware Supreme Court. On December 16, 2002,
this case was remanded to allow this Court to set
forth with particularity the reasons for imposing a
sentence that exceeded the SENTAC guidelines. A
response to the order of remand was filed on
February 28, 2003. The Defendant's conviction and
sentence were affirmed by the Supreme Court on
May 29, 2003.

*1 The Defendant filed the instant motion on May
7, 2004 seeking to withdraw his pleas and
presumably proceed to trial once more.[FN2] An
exchange of briefs and memoranda followed.
Having now had the opportunity to review those
submissions, that which follows is the Court's
response to the issues so presented.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EX. B

Not Reported in A.2d

Page 2

Not Reported in A.2d, 2005 WL 697940 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

> FN2. It appears Defendant is attempting to withdraw his guilty plea based upon the standard set forth in Superior Court Criminal Rule 32(d). Def. Mot., D.I. 58, at 2, 3. Defendant claims he should be allowed to withdraw his guilty plea for any "fair and just reason".Super. [Cite]. Crim. Rule 32(d). Rule 32(d) states that the standard of "fair and just reason" is only applicable to withdrawing a guilty plea before sentencing occurs. Defendant was sentenced in February of 2002, over three years ago. The only avenue available to defendant at this time is a post conviction motion under Rule 61. *See,* Super. [Cite].Crim. Rule 61(a)(1).

### DISCUSSION

**\*1** Before the Court can reach the merits of a motion for post-conviction relief, the movant must first overcome the substantial procedural bars contained in Superior Court Criminal Rule 61(I). FN3 Under Rule 61(I)(1), post-conviction claims for relief must be brought within three years of the movant's conviction becoming final.FN4 Further, any ground for relief not asserted in a prior post-conviction motion is thereafter barred unless consideration of the claim is necessary in the interest of justice.FN5 Similarly, grounds for relief not asserted in the proceedings leading to judgment of conviction are thereafter barred, unless the movant demonstrates: (1) cause for the procedural default, and (2) prejudice from any violation of the movant's rights.FN6 Any ground for relief that was formerly adjudicated in the proceedings leading to judgment of conviction or in a prior post-conviction proceeding is thereafter barred from consideration. FN7

> FN3. *Flamer v. State,* 585 A.2d 736, 745 (Del.1990); *Younger v. State,* 580 A.2d 552, 554 (Del.1990); *Saunders v. State,* 1995 WL 24888, at \*1 (Del.Supr.).

> FN4. Super. Ct.Crim. R. 61(i)(1).

> FN5. Super. Ct.Crim. R. 61(i)(2).

> FN6. Super. Ct.Crim. R. 61(i)(3).

> FN7. Super. [Cite].Crim. R. 61(I)(4).

**\*2** The procedural bars set forth in Rule 61(I)(1)-(4) may be lifted if the defendant establishes a colorable claim that there has been a "miscarriage of justice" under Rule 61(I)(5). A colorable claim of "miscarriage of justice" occurs when there is a constitutional violation that undermines the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction.FN8 This exception to the procedural bars is very narrow and is only applicable in very limited circumstances.FN9 The defendant bears the burden of proving that he has been deprived of a "substantial constitutional right." FN10 A claim of ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution, by its very nature, qualifies as just such an exception.FN11

> FN8. Super. [Cite].Crim. R. 61(I)(5).

> FN9. *Younger,* 580 A.2d at 555.

> FN10. *Id.*

> FN11. *Mason v. State,* 725 A.2d 442 (Del.1999); *State v. McRae,* 2002 WL 31815607, at \*5 (Del.Super.[Cite].).

**\*2** Under the standard outlined in *Strickland v. Washington,*FN12 two factors must be established in order to prevail on a claim of ineffective assistance of counsel. First, the Defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness. Second, he or she must show that counsel's actions were prejudicial to the defense, creating a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.FN13 The *Strickland* standard is highly demanding and under the first prong of the test, there is a "strong presumption that the representation was professionally reasonable." FN14 The Defendant must also "[o]vercome the presumption that, under the circumstances, the challenged action might be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 697940 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 3

considered sound trial strategy." [FN15]

> FN12. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, (1984).

> FN13. *Id.* at 694.

> FN14. *Stone v. State,* 690 A.2d 924, 925 (Del.1996); *Flamer,* 585 A.2d at 753.

> FN15. *Strickland,* 466 U.S. at 689.

**\*2** In the instant case, the Defendant's motion was filed well within the statutorily prescribed time period. This is also the first post-conviction relief sought by the Defendant and therefore raises no issues from a prior adjudication or motion. The Court must therefore proceed to examine the merits of the Defendant's claims, all of which appear to allege ineffective assistance of counsel. Unfortunately for the Defendant, they are all without merit.

**\*2** The Defendant raises three primary arguments in his motion relating to ineffective assistance of counsel. First, he alleges that due to ineffectiveness of his attorney, he was coerced and acted under duress at the time he entered his guilty plea. As a result, the plea was not entered knowingly and voluntarily. Second, the Defendant contends his attorney failed to investigate his case and develop mitigating evidence to support the contention that he acted under extreme emotional distress. Third, the Defendant alleges that defense counsel allowed the Court to enter a disproportionate sentence and therefore was ineffective. As a result of those transgressions, individually and collectively, the plea was not knowingly and voluntarily entered.

**\*2** Defendant's first claim of ineffective assistance of counsel is without factual support in the record. While the Defendant argues his counsel did not communicate with him throughout the plea negotiations, it appears that the Defendant's attorney fully informed the Defendant of all negotiations with the State regarding the plea agreement and their implications. In fact, the Defendant's attorney asserts that is was the Defendant who asked counsel

to approach the State about the possibility of a plea bargain. The Defendant's attorney also contends that the Defendant spoke with his family and was given the opportunity to "sleep on it" the night before making the final decision regarding his guilty pleas. The Defendant has not denied these assertions or offered any evidence to the contrary.

**\*3** Before the Defendant entered his pleas, he and the Court engaged in a colloquy.[FN16] The following portion of that exchange is particularly helpful in addressing the Defendant's argument in this regard:

> FN16. The plea colloquy was conducted pursuant to Super [Cite]. Crim Rule. 11.

**\*3** THE COURT: ... Do you understand that you had a right, and you're giving up by pleading guilty; you will not have a trial and you waive or give up your constitutional right to be presumed innocent, to a speedy and public trial, to a trial by jury, to hear and question the witnesses against you, to present evidence in your defense, to testify or not to testify, and to appeal to a higher court? Do you understand that?
**\*3** THE DEFENDANT: Yes Sir.

**\*3** THE COURT: Sir, do you have any questions regarding either document or any other aspect of this matter?
**\*3** THE DEFENDANT: No, Your Honor.
**\*3** THE COURT: Is anybody forcing you to do this, sir?
**\*3** THE DEFENDANT: No, sir
**\*3** THE COURT: Are you doing this of your own free will?
**\*3** THE DEFENDANT: Yes, sir.
**\*3** THE COURT: Have you fully discussed this matter with your attorneys and are you satisfied with their representation?
**\*3** THE DEFENDANT: Yes, sir.
**\*3** THE COURT: And, again, do you have any questions for the Court regarding any aspect of this matter?
**\*3** THE DEFENDANT: Just have mercy on me, sir.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 697940 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**\*3** THE COURT: Do you understand the consequences of what you are doing?

**\*3** THE DEFENDANT: Yes, sir.

**\*3** THE COURT: Now, Mr. Krafchick, I'm going-in terms of a plea itself, I know you discussed it with your attorneys and I know, indeed, according to Mr. Pankowski, you proposed it or at one point had considered it previously. And I believe your plea is a knowing and intelligent and voluntary one, given the circumstances, and I do so accept the same.... FN17

---

FN17. Plea Tr., at 6-8.

---

**\*3** The Defendant argues that he would have answered differently but did not understand the colloquy because of the ineffective assistance he received from his attorney. The Defendant is nevertheless bound by his statements unless he offers evidence which would invalidate the same. FN18 Because the Defendant is again unable to direct the Court's attention to any such evidence in the record, he can not escape the effect of the representations he made to the Court. Nor has he been able to explain exactly how and/or why he was confused.

---

FN18. *Bruno v. State,* 758 A.2d 933 (Del.2000); *Fullman v. State,* 560 A.2d 490 (Del.1989).

---

**\*3** In light of these circumstances, the Court must conclude that the Defendant's attorneys acted reasonably under the circumstances and that the result would not have been different if counsel's performance was deemed to have been somehow deficient. The Court finds that the plea was knowingly and voluntarily entered. They were not the product of coercion or anything other than the exercise of free will by the Defendant.

**\*3** The Defendant's second challenge involves the claim that his psychological health was not properly investigated by counsel and presented at trial. The Defendant contends that if he had continued with his trial and called the appropriate witnesses,

including himself, the jury would have been convinced of his "extreme emotional distress." That contention is simply not persuasive.

**\*4** The witnesses were not called because the Defendant entered a plea prior to the presentation of any defense in his case. What the Defendant would or could have put before the jury at this point is at best conjecture and is not supported by the record. He elected not to proceed and must live with that choice.

**\*4** In addition, defense counsel retained two psychological experts, Dr. Mandel Much and Dr. Carole Tavani. The prosecution hired its own expert, Dr. David Raskin. All were hired to evaluate the defendant's psychological status as it pertained to the commission of Ms. Krafchick's homicide. These evaluations were thoroughly reviewed by both sides along with the Court as noted in the Court's response to order of remand.FN19 The defense concluded that the testimony anticipated by its experts might not carry the day on that issue and rather than risk a conviction, the Defendant opted to enter the plea to a lesser charge.

---

FN19. Resp. to Order of Remand, at 5, J. Toliver (Feb.2003).

---

**\*4** Again, given this context, the Court cannot conclude that this representation offered by defense counsel was inadequate or professionally deficient. The Defendant has failed to establish that but for counsel's advice the outcome would have been different. Lastly, there is no basis to conclude that the Defendants plea was not voluntarily or freely entered based upon the failure to use the above mentioned psychological evidence differently.

**\*4** Defendant's third argument attacks the overall effectiveness of his counsel. It is at this point that he contends, relying on *Blakely v. Washington,* FN20 that because he was sentenced outside of guidelines provided by SENTAC, his sentence was illegal. He places the blame for that transgression on his attorney and asks that his sentence be vacated as a result.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 697940 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 5

FN20. 124 S. [Cite]. 2531 (2004)

**\*4** It is well-settled Delaware law that a sentence within the statutory limits prescribed by the General Assembly does not give rise to a legal or constitutional right of appeal.[FN21] Moreover, and as noted above, the fact that the Defendant was sentenced outside of SENTAC guidelines was specifically addressed by the Delaware Supreme Court in its order of remand to which this Court responded. The Supreme Court found no error when it affirmed the Defendant's conviction and sentence. Furthermore, unlike the Washington State guidelines at issue in *Blakely,* the sentencing standards established by SENTAC are non-biding and voluntary.[FN22] Consequently, the decision in *Blakely* has no effect on the present case.[FN23]

> FN21. *Mayes v. State,* 604 A.2d 839, 845 (Del.1992); *Gaines v. State,* 571 A.2d 765, 766-67 (Del.1990).

> FN22. *Benge v. State,* 826 A.2d 385, (Del.2004); *Walls v. State,* 2005 WL 277916 (Del.).

> FN23. *See, Blakely,* 124 S. [Cite]. 2531.

**\*4** To the extent that the Defendant claims that the Court's sentence was illegal or that defense counsel's representative contributed to the alleged miscarriage of justice, he is simply incorrect. Defense counsel asked that sentencing be postponed and a pre-sentence investigation be conducted. The Court declined to do so for reasons clearly stated on the record. Counsel argued for the minimum sentence allowed but was not able to persuade the Court to adopt his argument. There was nothing more that could have been done.

**\*5** As the Court has concluded with regard to the Defendant's other arguments, the Defendant has not met the standard pronounced in *Strickland* relative to this argument. The Defendant has not shown how defense counsel's representation fell below an objective standard of reasonableness in anything other than vague and conclusory statements. He is not, as a consequence, able to overcome the strong presumption that counsel's actions were proper. Even if the Defendant could have proven that defense counsel's actions were lacking, he has offered no credible evidence that the outcome of the trial would have been different if counsel had acted differently.

**\*5** No matter how the Defendant's challenges to his conviction and sentence are viewed, whether separately or together, he is not entitled to the relief sought. His right to counsel was not abridged and his treatment during the course of the instant prosecution was not otherwise subject to sanction.

### *CONCLUSION*

**\*5** For the foregoing reasons, the Defendant's motion for post-conviction relief must be, and hereby is, denied.

**\*5** IT IS SO ORDERED.

Del.Super.,2005.
State v. Krafchick
Not Reported in A.2d, 2005 WL 697940 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

823 A.2d 491

Page 1

823 A.2d 491, 2003 WL 21054791 (Del.Supr.)
**(Cite as: 823 A.2d 491)**

Krafchick v. StateDel.Supr.,2003.(The decision of
the Court is referenced in the Atlantic Reporter in a
'Table of Decisions Without Published Opinions.')
Supreme Court of Delaware.
Steven KRAFCHICK, Defendant Below, Appellant,
v.
STATE of Delaware, Plaintiff Below, Appellee.
**No. 135,2002.**

Submitted May 6, 2003.
Decided May 8, 2003.

Court Below: Superior Court of the State of
Delaware in and for New Castle County, Cr. I.D.
No. 0101010946.

Before HOLLAND, BERGER and STEELE,
Justices.

*ORDER*

*1 This 8th day of May, 2003, the Court, having
considered this matter on the briefs of the parties,
and having concluded that the same should be
affirmed on the basis of the trial court's Response to
Order of Remand dated February 28, 2003;

*1 NOW, THEREFORE, IT IS HEREBY
ORDERED that the judgment of the Superior Court
be, and the same hereby is

*1 AFFIRMED.

Del.Supr.,2003.
Krafchick v. State
823 A.2d 491, 2003 WL 21054791 (Del.Supr.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EX · A

IN THE SUPREME COURT OF THE STATE OF DELAWARE

135 , 2002

E. C. PANKOWSKI

STEVEN KRAFCHICK,
Defendant Below,
Appellant,

v.

T. J. DONOVAN

STATE OF DELAWARE,
Plaintiff Below,
Appellee.

DF $ 00.00

2002

| | | | |
|---|---|---|---|
| 1 | Mar | 18 | Letter dated 03/14/02 from Steven Krafchick to the Court informing the Court that he wishes to appeal. (served by mail 03/14/02) (mfm) (afb). |
| 2 | Mar | 20 | Notice to show cause issued to appellant. (clh) |
| 3 | Apr | 01 | Answer and Notice to Show Cause by Appellant. (served by mail 03/28/02) (mfm) |
| 4 | Apr | 01 | Appellant's certified receipt of notice to show cause on 3/25/02. (eas) |
| 5 | Apr | 15 | Letter dated 4-15-02 from Clerk to Loren C. Meyers, Esquire, requesting an answer to the appellant's answer to be filed no later than 4-29-02. (clh) |
| 6 | Apr | 23 | Letter dated 4/17/02 from appellant to Edward Pankowski and Court, regarding a 26(c) brief. (eas) |
| 7 | Apr | 25 | State's Memorandum in Support of Dismissal. (served by mail 04/25/02) (mfm) |
| 8 | May | 03 | Letter dated 5/3/02 from Assistant Clerk to Edward C. Pankowski, Esq. directing him to recognize his continuing obligation to represent Steven Krafchick on appeal by 5/13/02 and discharging the notice to show cause (afb). |
| 9 | May | 06 | Appellant's Reply to the State's Memorandum in Support of Dismissal. (served by mail 05/03/02) (mfm) |
| 10 | May | 15 | Formal Notice of Appeal from the Order dated 02/13/02 in Superior Court in and for New Castle County, by Judge Toliver, in Cr. A. No. IN01-01-2351, ID No. 0101010946, with designation of transcript. (served by hand 05/15/02) (mfm) |
| 11 | May | 15 | Directions to court reporter of proceedings below to be transcribed pursuant to Rule 9(e) by appellant. (service shown on court reporter by mail 05/15/02) (mfm) |

| 12 | May | 17 | Letter dated 5-17-02 from Clerk to Kathleen Feldman, the transcript is due to be filed by 6-27-02. (clh) |
|----|-----|----|---|
| 13 | Jun | 10 | Letter dated 6/7/02 from Steven Krafchick to Clerk, requesting a docket sheet. (sent) (eas) |
| 14 | Jun | 26 | Letter dated 6/23/02 from Steven Krafchick to Clerk, enclosing a copy of a letter to Edward Pankowski, Esquire, regarding his appeal. (eas) |
| 15 | Jul | 01 | Letter dated 6/26/02 from John P. Donnelly to Chief Deputy Clerk, requesting an extension to file the transcript. (eas) |
| 16 | Jul | 01 | Letter dated 7/1/02 from Senior Court Clerk to John P. Donnelly, granting an extension to file the transcript by 7/29/02. (eas) |
| 17 | Jul | 12 | Court reporter's final transcript log entry: Prothonotary received 7/10/02. (eas) |
| 18 | Jul | 12 | Letter dated 7/12/02 from Senior Court Clerk to Prothonotary, record is due to be filed by 7/22/02. (eas) |
| 19 | Jul | 19 | Record w/ transcript. (mfm) |
| 20 | Jul | 22 | Brief schedule issued. (opening brief due 8-19-02) (clh) |
| 21 | Aug | 22 | Brief delinquency notice dated 8/22/02 from Chief Deputy Clerk to appellant. (dlw) |
| 22 | Aug | 23 | Memo dated 08/23/02 from Clerk to Edward C. Pankowski, Esquire, rejecting the untimely filed opening brief and appendix. (mfm) |
| 23 | Aug | 27 | Letter dated 08/27/02 from J. Brendan O'Neill, Esquire to Clerk requesting that Edward Pankowski, Esquire be permitted to address the attempted late filing of his opening brief on 9/5/02 (service shown) (mfm) (afb). |
| 24 | Sep | 04 | Motion under Rule 15(b) by appellant. (served by mail 09/04/02) (mfm) |
| 25 | Sep | 06 | Letter dated 9-6-02 from Clerk to appellant, stating that the Court will accept his opening brief and appendix for filing, however, he must also file a letter stating the reasons for his failure to file the brief in a timely manner. (clh) |
| 26 | Sep | 09 | Appellant's opening brief and appendix. (served by hand 09/05/02) (mfm) |
| 27 | Sep | 09 | Letter dated 8/30/02 from Steven Krafchick, regarding his appeal. (eas) |
| 28 | Sep | 10 | Letter dated 9-10-02 from Clerk to Edward Pankowski, |

Esquire, forwarding Mr. Krafchick's letter for appro-
priate disposition. (clh)

29  Sep 11    Letter dated 09/11/02 from Edward C. Pankowski, Esquire
             to Clerk stating that appellant's opening brief was
             filed late due to the re-location of his office.
             (service shown) (mfm)

30  Sep 13    Brief deficiency notice dated 9/13/02 from Assistant
             Clerk to appellant (corrections due 9/20/02) (afb).

31  Sep 18    Letter dated 09/17/02 from Edward C. Pankowski, Esquire
             to Assistant Clerk referencing brief deficiency.
             (service shown) (mfm)

32  Sep 20    Letter dated 9/20/02 from Assistant Clerk to appellant
             requesting that he file an amended statement of facts
             with supporting references by 9/27/02 (afb).

33  Sep 25    Letter dated 9/20/02 from Steven Krafchick to Clerk,
             enclosing a copy of a letter for Edward C. Pankowski,
             Esquire and requesting a docket sheet. Also enclosing
             a letter from Steven Krafchick to Clerk, regarding his
             desire to supplement the opening brief. (sent)(eas)
             (clh)

34  Oct 02    Document entitled "Motion to Appoint New Appellate
             Counsel" by Steven Krafchick. (eas)

35  Oct 02    Letter dated 9/30/02 from Steven Krafchick to Clerk,
             requesting a docket sheet. (sent) (eas)

36  Oct 03    Letter dated 10-3-02 from Clerk to Edward Pankowski,
             Esquire, forwarding Mr. Krafchick's 9/30/02 document
             for appropriate disposition. (clh)

37  Oct 04    Letter dated 10/04/02 from Edward C. Pankowski, Esquire
             to Assistant Clerk enclosing brief corrections.
             (service shown) (mfm)

38  Oct 07    Appellee's answering brief and appendix. (served by
             hand 10/07/02) (mfm)

39  Oct 09    Notice dated 10-9-02 from Clerk to counsel, the case
             will be submitted for decision on briefs as of 11-26-02
             (clh)(RJH,CB,MTS)

40  Oct 10    Copy of letter dated 10-8-02 from appellant to Edward
             C. Pankowski, Jr., Esquire, regarding his appeal. (clh)

41  Oct 23    Letter dated 10/21/02 from Steven Krafchick to Clerk,
             requesting a docket sheet. (docket sheet and
             appellant's brief corrections sent) (eas)

42  Oct 29    Letter dated 10-27-02 from Mr. Krafchick to Clerk,
             requesting a copy of the State's answering brief and
             appendix. (clh)

43  Oct 29    Letter dated 10-29-02 from Clerk to Edward C. Pankowski

Esquire, forwarding Mr. Krafchick's letter for appro-
priate disposition. (clh)

44    Nov  06       Letter dated 11-4-02 from appellant to Clerk, regarding
                    the conflict of interest between himself and his
                    attorney. (clh)

45    Nov  12       Letter dated 11/12/02 from Senior Court Clerk to
                    Edward C. Pankowski, Jr., Esquire, forwarding Mr.
                    Krafchick's letter for appropriate disposition (eas)
                    (afb).

46    Nov  18       Copy of letter dated 11/8/02 from Edward Pankowski, Jr.
                    Esquire to Steven Krafchick, enclosing a copy of the
                    State's Answering Brief and Appendix and a copy of the
                    brief corrections to appellant's opening brief filed
                    10/14/02 (eas) (afb).

47    Dec  11       Order dated 12/11/02 by Steele, J., REMANDED with
                    jurisdiction retained. (RJH,CB,MTS) (eas)

48    Dec  12       Letter dated 12/10/02 from Steven Krafchick to Clerk,
                    requesting a docket sheet. (sent) (eas)

49    Dec  12       Record and certified copy of Order dated 12/11/02 to
                    clerk of court below. Jurisdiction is retained. Case
                    due to be returned by 2/10/03. (afb).

50    Dec  19       Letter dated 12-17-02 from appellant to Clerk, request-
                    ing a copy of the Court's order. (copy sent)(clh)

51    Dec  20       Prothonotary's receipt of record and certified order on
                    12-17-02. (clh)

  2003

52    Jan  07       Letter dated 1-4-03 from Steven W. Krafchick to Clerk,
                    regarding the decision on remand. (clh)

53    Jan  07       Letter dated 1-7-03 from Clerk to Edward Pankowski, Esq
                    forwarding Mr. Krafchick's letter for appropriate dis-
                    position. (clh)

54    Feb  20       Letter dated 2/12/03 from Steven Krafchick to Clerk,
                    regarding his appeal. (eas)

55    Feb  21       Letter dated 2/20/03 from Senior Court Clerk to Edward
                    C. Pankowski, Jr., Esquire, forwarding Mr. Krafchick's
                    letter for appropriate disposition. (eas)

56    Feb  21       Letter dated 2-21-03 from Clerk to Judge Toliver, the
                    case is now due to be returned from remand on 2-28-03.
                    (clh)

57    Mar  04       Response to Order of Remand by Judge Toliver. (eas)

58    Mar  10       Letter dated 3/10/03 from Senior Court Clerk to
                    parties, appellant's opening supplemental memo, not to
                    exceed 6 pages, is due 3/20/03; appellee's answering

|    |     |    | supplemental memo, not to exceed 6 pages, is due 3/31/03; appellant's reply supplemental memo, not to exceed 3 pages, is due 4/7/03. (eas) |
|----|-----|----|---|
| 59 | Mar | 10 | Letter dated 3/7/03 from Steven Krafchick to Clerk, requesting a docket sheet. (sent) (eas) |
| 60 | Mar | 14 | Letter dated 3-12-03 from appellant to Clerk, request-ing a copy of the decision returning the matter from remand. (clh) (copy sent) |
| 61 | Mar | 19 | Appellant's opening supplemental memorandum. (served by hand 03/19/03) (mfm) |
| 62 | Mar | 27 | Undated letter from Steven Krafchick to Clerk, regarding his appeal. (eas) |
| 63 | Mar | 27 | Letter dated 3/27/03 from Senior Court Clerk to Edward Pankowski, Esquire, forwarding Mr. Krafchick's letter with attachments for appropriate disposition. (eas) |
| 64 | Mar | 31 | State's answering supplemental memorandum. (served by hand 03/31/03) (mfm) |
| 65 | Apr | 01 | Undated letter from Steven Krafchick to Clerk, requesting a copy of the State Supplemental Memo and the docket sheet. (eas) |
| 66 | Apr | 01 | Letter dated 4/1/03 from Senior Court Clerk to Edward Pankowski, Esquire, forwarding Mr. Krafchick's letter for appropriate disposition. (eas) |
| 67 | Apr | 07 | Letter dated 4/4/03 from Steven Krafchick to Clerk, regarding his appeal. (eas) |
| 68 | Apr | 09 | To note on the docket, the appellant is not filing a supplemental reply memorandum. (dlw) |
| 69 | Apr | 11 | Letter dated 4/5/03 from Steven Krafchick to Clerk, enclosing copy of his letter dated 4/5/03 to Edward C. Pankowski, Esq. (served by mail 4/5/03) (eas) (afb). |
| 70 | Apr | 14 | Letter dated 4/14/03 from Senior Court Clerk to Edward Pankowski, Esquire, forwarding Mr. Krafchick's letters for appropriate disposition. (eas) |
| 71 | Apr | 21 | Notice dated 4-21-03 from Clerk to counsel, the case will be submitted for decision on briefs as of 5-6-03. (clh)(RJH,CB,MTS) |
| 72 | May | 08 | Order dated 05/08/03 by Berger, J., AFFIRMED (RJH,CB, MTS) (mfm) |
| 73 | May | 27 | Mandate to clerk of court below. Case Closed. (afb). |
| 74 | Jun | 05 | Letter dated 6/3/03 from Steven Krafchick to clerk requesting a copy of the docket sheet (sent) (afb). |
| 75 | Jun | 12 | Prothonotary's receipt of record and mandate on |

5/29/03. (eas)

76    Jun  13    Letter dated 6/10/03 from Steven Krafchick to Clerk,
              requesting a copy of the Order and enclosing a copy of
              a document entitled "Notice of Motion for Rehearing &
              en Banc". (eas)

77    Jun  16    Letter dated 6/16/03 from Senior Court Clerk to
              appellant, advising that the Court will take no further
              action with respect to his letter as it no longer has
              jurisdiction. (eas)

 2007

78    May  03    Letter dated 4/30/07 from appellant to Clerk,
              requesting copy of docket sheet. (copy sent) (lsb)

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    1
                         ( as of  05/10/2007 )
```

State of Delaware v.  STEVEN W KRAFCHICK                    DOB: 01/06/1965
State's Atty: MARIA T KNOLL , Esq.          AKA:
Defense Atty: EDWARD C PANKOWSKI , Esq.


Assigned Judge: TOLIVER CHARLES H. IV

Charges:

| Count | DUC# | Crim.Action# | Description | Dispo. | Dispo. Date |
|-------|------|--------------|-------------|--------|-------------|
| 001 | 0101010946 | PN01012351R2 | MURDER 2ND | GLTY | 02/13/2002 |
| 002 | 0101010946 | IN01012352R2 | PDWDCF | GLTY | 02/13/2002 |
| 003 | 0101010946 | IN01012517 | PDWBPP | NOLP | 02/13/2002 |
| 004 | 0101010946 | N01012518 | NONC W/CON BOND | NOLP | 02/13/2002 |
| 005 | 0101010946 | IN01012519 | UNLAW IMPR 2ND | NOLP | 02/13/2002 |
| 006 | 0101010946 | IN01012520 | ASSAULT 3RD | NOLP | 02/13/2002 |
| 007 | 0101010946 | IN01012521 | TERROR THREAT | NOLP | 02/13/2002 |
| 008 | 0101010946 | IN01012522 | OFF TOUCHING | NOLP | 02/13/2002 |
| 009 | 0101010946 | IN01012523 | CRIM CNTMPT DVP | NOLP | 02/13/2002 |
| 010 | 0101010946 | IN01012540 | NON COMP BOND | NOLP | 02/13/2002 |

```
      Event
No.   Date          Event                                    Judge
------------------------------------------------------------------------------
1     01/31/2001
      CASE ACCEPTED IN SUPERIOR COURT.
      ARREST DATE: 01/16/2001
      PRELIMINARY HEARING DATE:
      BAIL:
      HELD ON CASH BAIL                    50000.00 100
      HELD WITHOUT BAIL                        0.00
2     02/26/2001
      INDICTMENT, TRUE BILL FILED.  #143
      ARRAIGNMENT BAIL REPRESENTATION 03132001 9:30
3     02/26/2001
      MEMORANDUM TO RIDGELY, J. FOR ASSIGNMENT OF THE ABOVE CASE.
4     02/26/2001
      LETTER E-MAIL FROM PROY'S TO KNOLL, REQUESTING IF THIS CASE IS
      CAPITAL OR NON CAPITAL CASE.
6     02/28/2001
      NOTICE OF SERVICE - DISCOVERY RESPONSE FROM EDWARD PANKOWSKI, ESQ.
5     03/02/2001
      MEMO SPECIALLY ASSIGNING NON-CAPITAL FIRST DEGREE MURDER CASE
      TO:  JUDGE TOLIVER
      03/13/2001                                  REYNOLDS MICHAEL P.
      BAIL MODIFIED.  BAIL NOW SET AT
      HELD ON SECURED BAIL                 160000.00 100
      HELD WITHOUT BAIL  (2351)
```

SUPERIOR COURT CRIMINAL DOCKET                    Page    2
                    ( as of  05/10/2007 )

State of Delaware v.  STEVEN W KRAFCHICK                    DOB: 01/06/1965
State's Atty: MARIA T KNOLL , Esq.          AKA:
Defense Atty: EDWARD C PANKOWSKI , Esq.

```
       Event
No.    Date          Event                                   Judge
-----------------------------------------------------------------------------
```

7      03/13/2001                                   REYNOLDS MICHAEL P.
       ARRAIGNMENT CALENDAR, ARRAIGNED.
8      05/08/2001                                   TOLIVER CHARLES H. IV
       HEARING FOR SCHEDULING HELD.  TRIAL LENGTH TWO WEEKS; JURY SELECTION
       TO BEGIN 2/05/02; STATUS CONFERENCE 11/05/01 @ 10:30; PSYCH REPORT
       DUE 8/01/01; STATES RESPONSE DUE 11/02/01 FOR PSYCHS; MOTION DEADLINE
       11/02/01.
9      05/15/2001                                   RIDGELY HENRY DUPONT
       LETTER FROM PRESIDENT JUDGE RIDGLEY    TO JUDGE TOLIVER.
       RE: THIS NON-CAPITAL FIRST -DEGREE MURDER CASE IS SPECIALLY ASSIGNED
       TO YOU FOR ALL PURPOSES UNTIL FINAL DISPOSITION. DEFENDANT KRAFCHICK
       WAS ARRESTED ON JAN. 16, 2001 AND INDICTED BY THE GRAND JURY ON
       FEB. 26, 2001.
10     05/17/2001                                   TOLIVER CHARLES H. IV
       LETTER FROM JUDGE TOLIVER TO MARSHA EPSTEIN,ED PANKOWSKI, AND MARIAK K
       NOLL RE:  THE LETTER CONFIRMS THE RESULTS OF THE CONFERENCE HELD ON MA
       Y 8 CONERNING THIS DEFENDANT.
11     08/20/2001                                   TOLIVER CHARLES H. IV
       LETTER FROM EDWARD PANKOWSKI, JR., ASSISTANT PUBLIC DEFENDER
       TO: JUDGE TOLIVER
       IN CONJUCTION WITH THE COURTS LETTER OF MAY 16, 2001, PLEASE NOTE THAT
       THE DEFENSE WILL BE CALLING MANDEL MUCH, M.D., A PSYCHIATRIST AT THE
       TRIAL SCHEDULED TO BEGIN ON FEBRUARY 5, 2002.  I HAD A TELE-CONFERENCE
       WITH DR. MUCH ON AUGUST 10, 2001 AND HE ASSURED ME THAT A FULL REPORT
       IN WRITING WOULD BE IN MY OFFICE BY SEPTEMBER 15, 2001.  I WILL
       IMMEDIATELY FORWARD SAME TO THE PROSECUTORS.
12     10/01/2001                                   TOLIVER CHARLES H. IV
       LETTER FROM JUDGE TOLIVER TO MARSHA EPSTEIN, DEPUTY ATTORNEY GENERAL,
       MARIA KNOLL, DEPUTY ATTORNEY GENERAL, AND EDWARD PANKOWSKI, ASSISTANT
       PUBLIC DEFENDER
       RE: TO CONFIRM RESULTS OF 9/24/01 OFFICE CONFERENCE. ORDER SIGNED AT
       STATE'S REQUEST EXTENDING DATES FOR SUBMISSION OF EXPERT REPORTS BY
       BOTH THE DEFENSE AND STATE. DATE CHANGED OF STATUS CONFERENCE TO
       12/14/01. ALL OTHER ASPECTS OF THE ORDER ENTERED ON MAY 16, 2001,
       REMAIN THE SAME.
13     10/09/2001                                   TOLIVER CHARLES H. IV
       LETTER FROM MARSHA EPSTEIN, DEPUTY ATTORNEY GENERAL AND MARIA KNOLL,
       DEPUTY ATTORNEY GENERAL  TO JUDGE TOLIVER
       RE: THE STATE HAS NOT YET RECEIVED THE REPORT FROM DEFENSE EXPERT
       MANDEL MUCH, M.D. INITIALLY, THE COURT ORDERED THE DEFENSE TO PROVIDE
       ANY SUCH REPORT BY AUGUST 1, 2001. ON AUGUST 15, 2001, DEFENSE SUB-
       MITTED A LETTER INDICATING THAT THE REPORT WOULD BE PROVIDED BY SEPT.

```
                      SUPERIOR COURT CRIMINAL DOCKET              Page    3
                           ( as of  05/10/2007 )
```

State of Delaware v.  STEVEN W KRAFCHICK                        DOB: 01/06/1965
State's Atty: MARIA T KNOLL , Esq.            AKA:
Defense Atty: EDWARD C PANKOWSKI , Esq.

```
        Event
No.     Date          Event                                    Judge
------------------------------------------------------------------------------
```

        15, 2001. (ATTACHED) IT IS NOW FIVE DAYS PAST THAT DATE AND THE STATE
        HAS RECEIVED NOTHING FROM THE DEFENSE. THIS DELAY OF OVER 45 DAYS HAS
        MADE THE STATE'S DEADLINE FOR PRODUCTION OF ITS EXPERT REPORT BY NOV.
        2, 2001 IMPOSSIBLE. THE STATE HAS TAKEN STEPS TO SECURE ITS EXPERT
        BUT IS OBVIOUSLY HAMPERED BY THE DEFENDANT'S LACK OF COMPLIANCE WITH
        THE COURT'S SCHEDULE. AS SUCH, THE STATE REQUESTS THAT DEFENSE BE
        ORDERED TO SUPPLY ITS REPORT TO THE STATE NO LATER THAN OCT. 1, 2001.
        FURTHER, THE STATE REQUESTS THAT ITS DEADLINE OF NOV. 2, 2001 BE
        EXTENDED TO DEC. 15, 2001. IF THE STATE COMES INTO POSSESSION OF THE
        REPORT PRIOR TO THAT TIME, IT WILL IMMEDIATELY BE PROVIDED TO THE
        DEFENSE.
        THANK YOU FOR YOUR CONSIDERATION IN THIS MATTER.
14      12/14/2001                                    TOLIVER CHARLES H. IV
        OFFICE CONFERENCE PROCEEDING HELD. STATUS: COUNSEL PRESENT.
        TRIAL DATE:.....................FEB. 5, 2002
        DR. TIVANIS REPORT DUE:.........DEC. 28, 2001
        VOIR DIRE DUE...................JAN. 18,2002
        STATE'S RESPONSE TO DR'S RASKIN DUE: DEC. 18, 2001
        NEXT OFFICE CONFERENCE SCHEDULED FOR: JAN. 30, 2002. 8:30A.M.
15      12/27/2001
        MOTION TO ALLOW THE EXPERT TESTIMONY AND REPORTS OF DR. CAROL TAVANI
        AT TRIAL FILED.
        BY EDWARD PANKOWSKI & KATHRYN LUNGER
        REFERRED TO JUDGE TOLIVER 12/28/01
        01/01/2002
        ENTERED IN ERROR.
        .
31      01/17/2002
        LETTER FROM MARSHA EPSTEIN, ESQ. AND MARIA KNOLL, ESQ. TO JUDGE
        TOLIVER
        RE: STATE'S PROPOSED JURY VOIR DIRE FOR THIS CASE.
16      01/22/2002
        SUBPOENA(S) MAILED.
22      01/29/2002
        DEFENDANT'S PROPOSED VOIR DIRE QUESTIONS FILED.
17      01/31/2002
        MOTION FOR REARGUMENT FILED.
        BY MARSHA EPSTEIN
        REFERRED TO JUDGE TOLIVER 2/7/02
20      02/01/2002                                    TOLIVER CHARLES H. IV
        LETTER FROM EDWARD PANKOWSKI, ESQ. ASSISTANT PUBLIC DEFENDER
        TO: JUDGE TOLIVER

SUPERIOR COURT CRIMINAL DOCKET                Page    4
( as of   05/10/2007 )

State of Delaware v.  STEVEN W KRAFCHICK                    DOB: 01/06/1965
State's Atty: MARIA T KNOLL , Esq.            AKA:
Defense Atty: EDWARD C PANKOWSKI , Esq.

```
      Event
No.   Date        Event                               Judge
----------------------------------------------------------------------------
      RE: OFFICE CONFERENCE HELD ON JANUARY 30, 2002.  DEFENSE OBJECTS
      TO INTRODUCTION OF THE POLICE REPORT. DEFENSE ALSO RESERVES
      OBJECTION TO THE MANNEQUIN UNTIL IT IS VIEWED BY DEFENSE TO
      DETERMINE ITS RELEVANCE.
      ATTACHED COPIES OF MEDICAL AND POLICE REPORTS.
25    02/02/2002                                 TOLIVER CHARLES H. IV
      LETTER FROM MARSHA EPSTEIN AND MARIA KNOLL, DEPUTY ATTORNEYS GENERAL
      TO: JUDGE TOLIVER
      RE: STATE'S RESPONSE DEFENDANT'S LETTER OF MEMORANDUM IN OPPOSITION TO
      THE STATE'S INTENT TO INTRODUCE VICTIM STATEMENTS CONTAINED IN THE
      POLICE AND MEDICAL REPORTS REGARDING THE DECEMBER 20, 2002 DOMESTIC
      VIOLENCE INCIDENT.
24    02/04/2002                                 TOLIVER CHARLES H. IV
      LETTER FROM JUDGE TOLIVER TO MARSHA EPSTEIN, MARIA KNOLL, DEPUTY
      ATTORNEYS GENERAL AND KATHRYN LUNGER, ASSISTANT PUBLIC DEFENDER
      RE: RESPONSE TO MS. EPSTEIN'S MOTION ON BEHALF OF THE STATE ASKING TO
      REARGUE WHAT THE STATE VIEWED AS THE COURT'S RULING DIRECTING IT TO
      PROVIDE THE DEFENSE WITH DELJIS RECORDS PERTAINING TO PERSPECTIVE IN
      THIS MATTER.
18    02/05/2002                                 TOLIVER CHARLES H. IV
      TRIAL CALENDAR- WENT TO TRIAL JURY
19    02/08/2002
      STATE'S WITNESS SUBPOENA ISSUED.
21    02/08/2002
      SUBPOENA(S) SERVED BY SHERIFF.
23    02/11/2002                                 TOLIVER CHARLES H. IV
      LETTER FROM MARSHA EPSTEIN, ESQ. AND MARIA KNOLL, ESQ.
      TO: JUDGE TOLIVER
      RE: STATE'S REQUESTED JURY INSTRUCTIONS.
33    02/13/2002                                 TOLIVER CHARLES H. IV
      SENTENCE: ASOP ORDER SIGNED & FILED 4/12/02.
26    03/07/2002                                 TOLIVER CHARLES H. IV
      LETTER FROM MARSHA EPSTEIN, DEPUTY ATTORNEY GENERAL AND MARIA KNOLL,
      DEPUTY ATTORNEY GENERAL TO JUDGE TOLIVER.
      RE: THE STATE HAS PROVIDED OUR PSYCHIATRIC EXPERT, DR. DAVID RASKIN,
      A COPY OF THE PSYCHIATRIC REPORT PREPARED BY THE DEFENDANT'S EXPERT
      DR. CAROL TAVANI.   DR. RASKIN HAS INFORMED THE STATE THAT DR. TAVANI'S
      REPORT DOES NOT SPUR ANY FURTHER OR ADDITIONAL COMMENTS ON HIS PART.
      THEREFORE, THE STATE WILL NOT BE PROVIDING ANY ADDITIONAL DISCOVERY
      TO THE DEFENSE REGARDING PSYCHIATRIC EXPERT OPINIONS TO BE PROFFERED
      AT TRIAL.
28    03/15/2002
```

SUPERIOR COURT CRIMINAL DOCKET                    Page    5
( as of   05/10/2007 )

State of Delaware v.  STEVEN W KRAFCHICK                    DOB: 01/06/1965
State's Atty: MARIA T KNOLL , Esq.          AKA:
Defense Atty: EDWARD C PANKOWSKI , Esq.

```
        Event
No.     Date            Event                        Judge
--------------------------------------------------------------------------
        DEFENDANT'S LETTER FILED.
        RE: NOTICE OF APPEAL SENT TO MR. PANKOWSKI
29      03/18/2002
        LETTER FROM STEVEN KRAFCHICK TO SUPREME COURT
        RE: APPEAL.
30      04/05/2002
        DEFENDANT'S LETTER FILED.
        RE: NOTICE OF APPEAL,AND DIRECTIONS TO THE COURT REPORTER
32      04/17/2002
        DEFENDANT'S LETTER FILED. CC: SUPERIOR COURT. ADDRESSED TO COUNSEL.
        MR. PANKOWSKI.
        RE: VIDEO CONFERENCE FOR APPEAL AND SENTENCE REDUCTION.
34      05/02/2002
        MOTION FOR MODIFICATION OF SENTENCE FILED.
        BY EDWARD PANKOWSKI & KATHRYN LUNGER
        REFERRED TO JUDGE TOLIVER 5/9/02
37      05/13/2002
        DEFENDANT'S LETTER FILED. NOTICE OF "INSTRUCTIONS FOR COUNSEL"
36      05/14/2002                              TOLIVER CHARLES H. IV
        LETTER FROM MARSHA EPSTEIN, DEPUTY ATTORNEY GENERAL AND MARIA KNOLL,
        DEPUTY ATTORNEY GENERAL
        TO JUDGE TOLIVER   (DATED FEBRUARY 2, 2002)
        RE: LETTER OF MEMORANDUM AS THE STATE'S RESPONSE DEFENDANT'S LETTER OF
        MEMORANDUM IN OPPOSITION TO THE STATE'S INTENT TO INTRODUCE VICTIM
        STATEMENTS CONTAINED IN THE POLICE AND MEDICAL REPORTS REGARDING
        THE DECEMBER 20, 2002 DOMESTIC VIOLENCE INCIDENCE.
        ATTACHMENTS INCLUDING MEDICAL REPORT.
38      05/21/2002
        LETTER FROM SUPREME COURT TO SHARON AGNEW, PROTHONOTARY
        RE: THE FORMAL NOTICE OF APPEAL WAS FILED ON MAY 15, 2002.
        THE TRANSCRIPT IS DUE TO BE FILED WITH THE PROTHONOTARY NO LATER
        THAN JUNE 27, 2002.
        135, 2002.
35      05/24/2002                              TOLIVER CHARLES H. IV
        ORDER:AND NOW, TO WIT, THIS 21ST DAY OF MAY,A.D., 2002, THE FOREGOING
        MOTION HAVING BEEN READ AND CONSIDERED, IT IS HEREBY;
        IT IS ORDERED THAT THE MOTION IS DENIED FOR THE REASONS GIVEN AT THE
        TIME OF SENTENCING. IT IS ALSO BASED UPON THE MANNER OF THE
        COMMISSION OF THE CRIME & THE DEFENDANT'S ACTIVITIES IN FURTHERANCE
        OF THE CRIME &/OR ITS CONCEALMENT UNDER THE CIRCUMSTANCES A LESSER
        SENTENCE WOULD AMOUNT TO AN ABUSE OF DISCRETION.
39      06/27/2002
```

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    6
                       ( as of   05/10/2007 )

State of Delaware v.  STEVEN W KRAFCHICK                  DOB: 01/06/1965
State's Atty: MARIA T KNOLL , Esq.           AKA:
Defense Atty: EDWARD C PANKOWSKI , Esq.


       Event
No.   Date          Event                              Judge
----------------------------------------------------------------------------
       TRANSCRIPT FILED.
       PLEA TRANSCRIPT.FEBRUARY 13, 2002.
       BEFORE JUDGE TOLIVER.
40    06/27/2002
       TRANSCRIPT FILED.
       TRIAL TRANSCRIPT. FEBRUARY 12, 2002.
       BEFORE JUDGE TOLIVER.
41    07/03/2002
       LETTER FROM SUPREME COURT TO JOHN DONNELLY, COURT REPORTER
       RE: THE COURT HAS GRANTED YOUR REQUEST FOR EXTENSION TO FILE
       THE TRANSCRIPT. THE TRANSCRIPT IS DUE NO LATER THAN JULY 29, 2002
       135, 2002
42    07/10/2002
       TRANSCRIPT FILED.
       TRANSCRIPT OF TRIAL TESTIMONY. FEBRUARY 6, 2002.
       BEFORE JUDGE TOLIVER.
43    07/10/2002
       TRANSCRIPT FILED.
       TRANSCRIPT OF TRIAL TESTIMONY. FEBRUARY 8, 2002.
       BEFORE JUDGE TOLIVER.
44    07/10/2002
       TRANSCRIPT FILED.
       TRANSCRIPT OF TRIAL TESTIMONY. FEBRUARY 7, 2002.
       BEFORE JUDGE TOLIVER.
45    07/16/2002
       LETTER FROM SUPREME COURT TO SHARON AGNEW, PROTHONOTARY
       RE: THE RECORD AND TRANSCRIPT MUST BE FILED WITH THIS OFFICE
       NO LATER THAN JULY 22, 2002.
       135, 2002.
       07/18/2002
       RECORDS SENT TO SUPREME COURT.
46    07/19/2002
       RECEIPT FROM SUPREME COURT ACKNOWLEDGING RECORD.
47    07/25/2002
       MOTION FOR TRANSCRIPTS (PRO SE)   FILED.
       REFERRED TO JUDGE TOLIVER.
48    08/27/2002                              TOLIVER CHARLES H. IV
       LETTER FROM   STEVEN W. KRAFCHICK            TO PROTHONATORY
       RE:   STEVEN W. KRAFCHICK
       TO WHOM IT MAY CONCERN:
       CAN YOU PLEASE ADD THESE DOCUMENTS TO MY FILE, AND WHEN RECORDED SEND
       ME AN UPDATED DOCKET SHEET WITH THOSE DOCUMENTS ON RECORD.  SEE DOCU-
```

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    7
                         ( as of   05/10/2007 )
```

State of Delaware v.  STEVEN W KRAFCHICK                    DOB: 01/06/1965
State's Atty: MARIA T KNOLL , Esq.          AKA:
Defense Atty: EDWARD C PANKOWSKI , Esq.

```
        Event
No.   Date          Event                             Judge
------------------------------------------------------------------------------
        MENTS IN FILE.
49    09/24/2002
        MOTION FOR TRANSCRIPT FILED.
        PRO-SE MOTION REFERRED TO JUDGE TOLIVER.
50    10/09/2002                             TOLIVER CHARLES H. IV
        LETTER/ORDER ISSUED BY JUDGE: TOLIVER. MOTION FOR TRANSCRIPTS DENIED.
51    10/23/2002
        LETTER FROM: EDWARD PANKOWSKI, PD.     TO: DEFENDANT
        RE: ENCLOSED PLEASE FIND COPIES OF YOUR COMPLETE TRIAL TRANSCRIPTS
        PLUS SENTENCING FROM FEBRUARY 7, 2002 THROUGH FEBRUARY 13, 2002.
52    10/23/2002                             TOLIVER CHARLES H. IV
        LETTER FROM JUDGE TOLIVER TO DEFENDANT.
        RE: THE COURT IS IN RECEIPT OF YOUR MOTION FOR TRANSCRIPTS, FILED
        WITH THE PROTHONOTARY ON SEPTEMBER 24, 2002. THIS LETTER SERVES AS
        NOTICE THAT MR. ED PANKOWSKI, ESQUIRE OF THE PUBLIC DEFENDER'S
        OFFICE HAS AGREED TO SEND YOU COPIES OF THE TRANSCRIPTS YOU HAVE
        REQUESTED. AS A RESULT, YOUR MOTION MUST BE, AND HEREBY IS MOOTED
        AT THIS TIME.
53    12/16/2002
        MANDATE FILED FROM SUPREME COURT:  CASE REMANDED TO SUPERIOR COURT.
        SUPREME COURT CASE NO: 135, 2002
        PURPOSE: FOR THE TRIAL JUDGE TO SET FORTH WITH PARTICULARITY THE
        REASONS FOR IMPOSING A SENTENCE THAT EXCEEDED THE DELAWARE
        SENTENCING GUIDELINES IN ACCORDANCE WITH THIS COURT'S ADMINISTRATIVE
        DIRECTIVE NUMBER SEVENTY-SIX AND SIPLE V. STATE.
54    02/28/2003
        RESPONSE TO ORDER OF REMAND: FILED BY JUDGE TOLIVER.
55    05/29/2003
        MANDATE FILED FROM SUPREME COURT:  SUPERIOR COURT JUDGMENT AFFIRMED.
        SUPREME COURT CASE NO: 135, 2003
        SUBMITTED: MAY 6, 2003
        DECIDED: MAY 8, 2003
        BEFORE HOLLAND, BERGER AND STEELE, JUSTICES.
56    07/16/2003
        MOTION FOR APPOINTMENT OF COUNSEL FILED PROSE.  REFEERRED TO JUDGE
        TOLIVER
57    07/24/2003                             TOLIVER CHARLES H. IV
        ORDER: MOTION FOR APPOINTMENT OF COUSEL IS DENIED.
58    05/07/2004
        MOTION FOR POSTCONVICTION RELIEF FILED. PRO SE
        REFERRED TO JUDGE TOLIVER.
59    05/13/2004
```

SUPERIOR COURT CRIMINAL DOCKET                Page    8
( as of  05/10/2007 )

State of Delaware v.  STEVEN W KRAFCHICK                    DOB: 01/06/1965
State's Atty: MARIA T KNOLL , Esq.         AKA:
Defense Atty: EDWARD C PANKOWSKI , Esq.

```
     Event
No.  Date        Event                                  Judge
------------------------------------------------------------------------------
     LETTER FROM A.HAIRSTON, PROTH. OFFICE TO MARIA KNOLL, DAG
     RE: NOTICE OF FILING OF PRO SE MOTION FOR POSTCONVICTION RELIEF.
60   06/08/2004                                TOLIVER CHARLES H. IV
     LETTER FROM JUDGE TOLIVER  TO COUNSEL. RE: RULE 61. THIS LETTER IS TO
     SERVE AS THE COURT'S ORDER FOR THE STATE TO FILE A RESPONSE TO
     DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF, PURSUANT TO SUPERIOR
     COURT CRIMINAL RULE 61(C)(4) AND 61(F)(1). FURTHERMORE, THE DEFENSE
     COUNSEL IS HEREBY ORDERED TO FILE A RESPONSE. ALL SUBMISSIONS MUST BE
     FILED BY JUNE 30, 2004.
61   06/25/2004                                TOLIVER CHARLES H. IV
     LETTER/ORDER ISSUED BY JUDGE: TOLIVER. I HAVE NOW HAD THE OPPORTUNITY
     TO REVIEW THE LETTER YOU SENT ME DATED JUNE 16, WHICH I RECEIVED ON
     JUNE 21 CONCERNING THE BRIEFING SCHEDULE IN THE ABOVE-REFERENCED
     MATTER. MR. PANKOWSKI HAS NOT RESPONDED OR OTHERWISE INDICATED HE HAS
     ANY POSITION IN OPPOSITION TO THE SCHEULE THAT YOU HAVE OUTLINED. AS
     A RESULT, MR. PANKOWSKI RESPONSE WOULD BE DUE ON OR BEFORE JUNE 30, 04
     AND THE STATE'S SUNMISSION WOULD BE DUE ON OR BEFORE JULY 30, 04.
     IT IS SO ORDERED.
     LETTER SENT TO DEPUTY ATTORNEY GENERAL'S.
63   07/02/2004
     AMENDED MOTION FOR POSTCONVICTION RELIEF FILED PRO SE
     REFERRED TO JUDGE TOLIVER.
62   07/07/2004
     LETTER FROM: MARIA KNOLL AND MARSHA EPSTEIN, DAG.  TO: JUDGE TOLIVER.
     THE STATE IS IN RECEIPT OF OUR HONOR'S ORDER REQUIRING  SIMULTANEOUS
     RESPONSE FROM THE STATE AND TRIAL COUNSEL, EDWARD PANKOWSKI, JR. BY
     JUNE 30, 2004 TO THE RULE 61 MOTION FILED BY DEFT., STEVEN W.
     KRAFCHICK.
     SINCE DEFENDANT RAISES INEFFECTIVE ASSISTANCE OF COUNSEL ARGUMENTS,
     THE STATE BELIEVES THAT IT WOULD BENEFIT FROM AND INDEED, WOULD NEED
     TO REVIEW MR. PANKOWSKI'S RESPONSE PRIOR TO THE FILING OF ITS OWN
     RESPONSE. AS SUCH, THE STATE, HEREBY, RESPECTFULLY REQUESTS THAT MR.
     PANKOWSKI SUBMIT HIS RESPONSE TO MR. KRAFCHICK'S MOTION ON OR BEFORE
     JUNE 30, 2004 AND THAT THE STATE, HAVING THE BENEFIT OF MR.
     PANKOWSKI'S RESPONSE AND BE ALLOWED TO RESPOND WITHIN 30 DAYS OF THE
     RECEIPT OF SAID RESPONSE. THIS WILL OBVIATE THE NEED FOR THE STATE TO
     FILE A SUPPLEMENTAL RESPONSE UPON REVIEW OF MR. PANKOWSKI'S AFFIDAVIT
64   07/16/2004                                TOLIVER CHARLES H. IV
     LETTER FROM  JUDGE TOLIVER      TO MARIA KNOLL, DAG
     RE: TJE COURT HAD REVIEWED MR. KRAFCHICK'S AMENDMENT TO HIS RULE 61
     POSTCONVICTION MOTION WHICH WAS RECEIVED ON OR ABOUT JULY 2, 2004. IN
     LIGHT OF HIS RECENT CONTENTIONS, THE COURT IS GRANTING THE STATE AN
```

SUPERIOR COURT CRIMINAL DOCKET                 Page     9
( as of   05/10/2007 )

State of Delaware v.  STEVEN W KRAFCHICK                      DOB: 01/06/1965
State's Atty: MARIA T KNOLL , Esq.           AKA:
Defense Atty: EDWARD C PANKOWSKI , Esq.


      Event
No.   Date          Event                                    Judge
-------------------------------------------------------------------------------
      ADDITONAL THIRTY (30) DAYS FROM THE ORIGINAL DEADLINE DATE OF JULY 30,
      2004 IN WHICH TO FILE A RESPONSE. THEREFORE, THE STATE'S RESPONSE IS
      DUE NO LATER THAN AUGUST 31, 2004. A COURTESY COPY SHOULD BE SENT TO
      CHAMBERS.
66    07/20/2004
      AMENDED MOTION TO BE INCORPORATED INTO HIS MEMORANDUM OF LAW IN
      SUPPORT OF RULE 61 MOTION.
65    07/30/2004
      AFFIDAVIT OF DEFENSE COUNSEL IN RESPONSE TO RULE 61 MOTION FOR POST-
      CONVICTION RELIEF.
      FILED BY EDWARD PANKOWSKI, ESQ
67    08/05/2004
      MOTION FOR APPOINTMENT OF COUNSEL (RULE 61)  FILED. PRO SE
      REFERRED TO JUDGE TOLIVER.
68    08/05/2004
      APPLICATION TO PROCEED INFORMA PAUPERIS FILED PRO SE
      REFERRED TO JUDGE TOLIVER.
69    08/05/2004
      MEMORANDUM OF LAW FILED IN SUPPORT OF MOTION FOR POSTCONVICTION RELIEF
      FILED PRO SE
      REFERRED TO JUDGE TOLIVER.
70    08/27/2004                            TOLIVER CHARLES H. IV
      ORDER: PETITION FOR APPOINTMENT OF COUNSEL FOR POSTCONVICTION  RELIEF.
      IS DENIED.  SEE FILE.
72    09/07/2004
      EMAIL FILED TO: JUDGE TOLIVER            FROM: MARIA KNOLL, DAG
      I SPOKE WITH YOUR LAW CLERK LAST WEEK REGARDING NEEDING A LITTLE EXTRA
      TIME TO COMPLETE THE STATE'S RULE 61 RESPONSE IN THE ABOVE CASE AND
      SHE STATED SHE WOULD NOTE THE FILE. I HAVE BEEN OUT OF THE OFFICE DUE
      TO MY VACATION AND MY DAUGHTER NEEDING MUCH DENTAL WORK AND HAVE HAD
      LITTLE TIME TO COMPLETE THE RULE 61. MAY I HAVE UNTIL NEXT WEEK TO
      COMPLETE THIS RULE 61?
      RESPONSE FROM JUDGE TOLIVER BY E-MAIL.
      YES.
71    09/14/2004
      STATE'S RESPONSE TO DEFENDANT'S MOTION FOR POST CONVICTION RELIEF.
      REFERRED TO JUDGE TOLIVER
      FILED BY MARIA KNOLL, ESQ & MARSHA WHITE, ESQ
75    09/14/2004
      DEFENDANT'S LETTER FILED. REQUESTING COURT DOCKET.
73    10/19/2004
      DEFENDANT'S RESPONSE TO STATE'S ANSWER IN POST-CONVICTION RELIEF.

```
                    SUPERIOR COURT CRIMINAL DOCKET                Page    10
                          ( as of  05/10/2007 )

State of Delaware v.  STEVEN W KRAFCHICK                      DOB: 01/06/1965
State's Atty: MARIA T KNOLL , Esq.          AKA:
Defense Atty: EDWARD C PANKOWSKI , Esq.


       Event
No.    Date          Event                              Judge
-------------------------------------------------------------------------------
       PRO SE
       REFERRED TO JUDGE TOLILVER.
  74   11/15/2004
       AMENDMENT TO RESPONSE TO STATE'S ANSWER IN POST CONVICTION RELIEF.
       FILED PRO SE
       REFERRED TO JUDGE TOLIVER
  76   02/25/2005
       DEFENDANT'S LETTER FILED.
       LETTER REQUESTING UPDATE ON POST-CONVICTION MOTION.
  77   03/08/2005                                    TOLIVER CHARLES H. IV
       OPINION AND ORDER ON THE DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF
       DENIED.
       IT IS SO ORDERED.
  78   04/06/2005
       DOCUMENT(S) FILED REGARDING SUPREME COURT APPEAL.
       RE: STATEMENT PURSUANT TO RULE 9 (E)
  79   04/14/2005
       LETTER FROM SUPREME COURT TO SHARON AGNEW, PROTHONOTARY
       RE: A NOTICE OF APPEAL WAS FILED IN SUPREME COURT APRIL 1, 2005.
       THE RECORD IS DUE APRIL 25, 2005.
       124, 2005
       04/19/2005
       RECORDS SENT TO SUPREME COURT.
  80   04/25/2005
       RECEIPT FROM SUPREME COURT ACKNOWLEDGING RECORD.
       124, 2005
  83   08/29/2005
       MOTION TO COMPEL FILED PRO SE.  REFERRED TO JUDGE GEBELEIN.
  81   11/14/2005                                    TOLIVER CHARLES H. IV
       ORDER: PLEASE BE ADVISED THAT I HAVE NOW HAD THE OPPORTUNITY TO REVIEW
       YOUR "MOTION TO COMPEL", WHICH YOU ALSO REFER TO AS A "MOTION FOR
       COMPLIANCE", DATED AUGUST 24, 2005, WHICH WAS RECEIVED BY THE
       PROTHONOTARY ON AUGUST 29.  THAT WHICH FOLLOWS IS MY RESPONSE.  I DO
       NOT BELIEVE THERE IS ANY AUTHORITY, NOR DO YOU REFER TO ANY, WHICH
       ALLOWS YOU TO FILE SUCH A MOTION.  HOWEVER, BY COPY OF THIS LETTER AND
       YOUR MOTION, I AM ASKING THAT THE DEPARTMENT OF CORRECTION, THROUGH
       MR. HOSTERMAN, PROVIDE YOU WITH ANY AND ALL APPROPRIATE MEDICAL
       TREATMENT, INCLUDING A MENTEL HEALTH EVALUATION AND/OR COUNSELING.  I
       BELIEVE THAT SHOULD ADDRESS YOUR CONCERNS.  HOWEVER, YOUR MOTION IS
       OTHERWISE DENIED.  IT IS SO ORDERED
  82   11/14/2005                                    TOLIVER CHARLES H. IV
       LETTER FROM: JUDGE TOLIVER              TO: MR. HOSTERMAN
```

SUPERIOR COURT CRIMINAL DOCKET                    Page    11
( as of  05/10/2007 )

State of Delaware v.  STEVEN W KRAFCHICK                      DOB: 01/06/1965
State's Atty: MARIA T KNOLL , Esq.        AKA:
Defense Atty: EDWARD C PANKOWSKI , Esq.

```
      Event
No.   Date          Event                              Judge
-------------------------------------------------------------------------------
      ENCLOSED YOU WILL FIND A COPY OF MY RESPONSE TO MR. KRAFCHICK'S MOTION
      DATED AUGUST 24, 2005.  A COPY OF THAT MOTION IS ALSO ENCLOSED.  IF
      THERE IS ANYTHING ELSE I NEED TO DO TO ASSIST IN THE PROCESS OF
      OBTAINING AN EVALUATION AND/OR TREATMENT FOR MR. KRAFCHICK, PLEASE DO
      NOT HESITATE TO SO INFORM ME.
84    02/03/2006
      MANDATE FILED FROM SUPREME COURT:  SUPERIOR COURT JUDGMENT AFFIRMED.
      SUPREME COURT CASE NO: 124, 2005
      SUBMITTED: NOVEMBER 4, 2005
      DECIDED: JANUARY 17, 2006
      BEFORE STEELE, CHIEF JUSTICE, BERGER AND JACOBS, JUSTICES.
85    03/22/2006
      MOTION FOR POSTCONVICTION RELIEF FILED. PRO SE
      REFERRED TO JUDGE TOLIVER
86    03/24/2006
      LETTER FROM A. HAIRSTON PROTH. OFFICE    TO MARIA KNOLL, ESQ
      RE: NOTICE OF FILING OF PRO SE MOTION FOR POSTCONVICTION RELIEF.
      ATTACHED: COPY OF MOTION.
87    04/26/2006                                    TOLIVER CHARLES H. IV
      LETTER FROM  JUDGE TOLIVER     TO MARIA KNOLL, DAG. RE: RULE 61
      RE: BY NOW YOU HAVE RECEIVED A COPY OF THE PETITION FOR POSTCONVICTION
      RELIEF THAT WAS FILED BY KRAFCHICK IN CONNECTION WITH THE ABOVE-
      REFERENCED MATTER. PLEASE PROVIDE ME WITH THE STATE'S RESPONSE ON OR
      BEFORE MAY 19, 2006
88    06/05/2006
      STATE'S RESPONSE TO DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF
      PURSUANT TO SUPERIOR COURT CRIMINAL RULE 61.
      FILED BY MARIA KNOWLL, DAG
      REFERRED TO JUDGE TOLIVER
89    07/10/2006
      DEFENDANT'S REPLY TO STATE'S RESPONSE TO DEFENDANT'S MOTION FOR POST-
      CONVICTION RELIEF PURSUANT TO SUPERIOR COURT CRIMINAL RULE 61(F)(3)
      PRO SE
      REFERRED TO JUDGE TOLIVER.
90    09/20/2006                                    TOLIVER CHARLES H. IV
      LETTER/ORDER ISSUED BY JUDGE TOLIVER. RE: RULE 61 IS DENIED.
      IT IS SO ORDERED.
91    10/12/2006
      NOTICE OF APPEAL FILED IN SUPREME COURT (COPY)
92    10/17/2006
      LETTER FROM SUPREME COURT TO SHARON AGNEW, PROTHONOTARY
      RE: A NOTICE OF APPEAL WAS FILED ON 10/12/06
```

SUPERIOR COURT CRIMINAL DOCKET                     Page    12
( as of  05/10/2007 )

State of Delaware v.  STEVEN W KRAFCHICK                    DOB: 01/06/1965
State's Atty: MARIA T KNOLL , Esq.          AKA:
Defense Atty: EDWARD C PANKOWSKI , Esq.

      Event
No.   Date         Event                              Judge
--------------------------------------------------------------------------
      THE RECORD MUST BE FILED 11/06/06.
      555, 2006
      10/19/2006
      RECORDS SENT TO SUPREME COURT.
93    10/25/2006
      RECEIPT FROM SUPREME COURT ACKNOWLEDGING RECORD.
      555, 2006

           *** END OF DOCKET LISTING AS OF  05/10/2007 ***
           PRINTED BY: CSCKWAL